## The Mayor, Aldermen and Inhabitants of the City of Galveston v. Michael B. Menard.
## Same v. Abram P. Luffkin.

Whether or not, the claim of the Republic of Texas, defining her boundaries, as extending along the coast, three leagues from land, was admitted by other nations to a greater extent than one marine league from the shore, would have depended very much upon her power to have enforced it; but, as between her own citizens, in respect to the right of the soil, the boundary prescribed is conclusive.

By the civil law, the shores of the sea, bays, and rivers, belong to the nation that possess the country, of which they are a part. But, while they are of the class of public things, common to all, to which no exclusive right will ordinarily be granted, yet, it often happens, that the public use may be promoted, by allowing portions of them to become private property.

By the common law, the right to such property, is vested in the king, as trustee for the public; and since the time of *magna charta*, he cannot grant it, though parliament may.

The legislatures of the several states may grant it, if not appropriated by prescription, or otherwise; provided it does not infringe upon the power of the United States, "to regulate commerce with foreign nations, and among the several states."

In view, either of the civil or common law, the Republic of Texas, as a result of its absolute sovereignty over the territory included in its limits, had the power, through its legislative department, in 1836, to grant that part of Galveston bay, south of the channel, called the "flats," usually covered with salt water, so as to vest an exclusive right to the soil in the grantee.

Such a grant does not infringe the right of the United States to regulate commerce.

The divisible character of this species of property being such, that it may become partly public and partly private; the different modes of its use, and the diversified means of its acquisition, in England and the Atlantic states, from that in Texas, have exceedingly complicated the subject, and renders much of their legal learning inapplicable here.

The shore of a sea, or bay, as defined by the civil law, is the line of the highest tide in winter.

By the common law, an ordinary grant of land upon a bay, is limited to the line of ordinary high tide.

The terms of a grant may be aided and extended beyond their usual import, by long possession alone, consistent with such enlarged construction, though not specifically or plainly expressed.

The act of the congress of the Republic of Texas, of December 9th, 1836, relin-

City of Galveston v. Menard.

quishing to M. B. Menard " one league and one labor of land, lying and situate on, and including the east end of Galveston island," if viewed as an ordinary grant, would not include the shore and flats, lying south of the channel of the bay.

But, in view of the object of the said legislative grant, its locality, and the acts of the contracting parties, it was clearly intended to include " the flats" therein, so as to build up a city upon it, with streets and lots, running to and bordering on the channel.

That more certainty of intention, to grant land covered with tide water, than land not so covered, should be required, is not owing to any difference in the right of the state, but to the character of the property, in its relation to commerce.

It is fair to presume, that the president was consulted, and understood the object of such grant, and properly designated the northern boundary, in executing the title.

The call in the title to run from the beginning corner, as therein described, " due north 150 varas to a stake; thence eastwardly with the channel of the harbor in the bay of Galveston, and with the general course of the island, at the distance of at least 150 varas from the shore, to a stake 150 varas from the extreme eastern point of said island," should be construed, (considered with reference to the object of the grant,) that the line should run from the beginning point, eastwardly, keeping at least 150 varas from the shore, to the channel, and not in a direct line to the nearest point of it.

The action of the city company, in giving notice, at the time of the sale of lots, that the survey of the city was not complete, but that other lots would be laid off in front of those represented in the imperfect plan exhibited, &c., was not the reservation of a right to extend the city, but in the nature of an undertaking, that lots would be laid off, or considered as laid off, in front, so as to exhaust the land granted, to the channel.

Such notice amounted to something more than a reservation for the benefit of the company. But if a reservation of the right of so laying it off, it does not follow, that they reserved the right of doing any thing else, than laying it off in blocks and streets, according to the general plan of the city.

The Act of the 5th February, 1840, incorporating the city, shows that congress anticipated that the city might establish wharves and regulate them, and that this would not be inconsistent with the recognised fact, that the front line of the bay, where they must be built, was the boundary of Menard's grant; evidently upon the construction that the streets should run to the channel.

The same necessary implication, founded upon the intention of the parties, in accomplishing the object of the grant, which, by construction, extends the grant, under which the city company hold, to the channel, equally requires the extention of the streets to the same line.

The city has the right to open the streets to the channel, unless it has lost it by prescription : [or unless, as suggested, though not decided, this right has been qualified by the Act of February 16th, 1852.—REPS.].

Menard, and his vendees, being the owners of the soil in the "flats," in front of the *lots out to the channel*, may devote it to wharves, or the like, without being subject to the control of the public; under the qualification incident to all property, that it is not so used as to be a common nuisance.

The city has the same right to build and control wharves in front of the streets.

The rights growing out of the dedication of a street, vest in the town and its citizens, and are to be protected by them for the public, against the operation of the statute of limitations, or the presumptions arising from adverse claim and possession, as they apply in cases of private right or public easements.

Possession for five years, with the requisites prescribed by the statute, of a public street, will confer upon the possessor full title.

As a consequence of the character of property in a street, or other common property, nothing short of a visible appropriation of it, to the exclusion of the public, except at the discretion of the owner, can be held to be adverse.

ERROR from Galveston. Tried below before the Hon. Nelson H. Munger. A jury was waived, and the causes submitted to the court. The other facts are sufficiently apparent from the opinion.

*F. H. Merriman, M. M. Potter,* and *L. A. Thompson,* for the plaintiffs in error.—The right of the plaintiff to the *locus in quo,* is the main question in this case; and this right, so far as the present controversy is concerned, may be successfully maintained, upon either of the two following views: 1. On the hypothesis of a valid grant by the sovereignty of Texas, to Menard and his associates, through and under whom the defendant claims title, of the *shore* of the island of Galveston, on the north or bay side, and of a dedication of the *locus in quo,* to the inhabitants of the city, or to the public use, by the projectors and founders of the town: and, 2. If the *shore* of the island of Galveston, on the bay of Galveston, was not conveyed, or relinquished, by the Republic of Texas, by the Act of December 9th, 1836; and did not pass by the patent of the President of the republic, of the 25th January, 1838, to the said Menard, or was not otherwise duly and legally granted to him; but that the same remained the property of the republic, and state of Texas, until December 8th, 1851, that it was by an act of the legisla-

ture, of the last mentioned date, granted to the plaintiff for the use of the inhabitants of the city, &c.

1st. Of the dedication. There are two modes by which a dedication of land for streets, avenues, squares, alleys, commons, and other public places in a town, for the common or public use, may be established: one, by the length of time it has been in actual use as such; the other, by some act of the proprietor, or owner, of the fee, so positive and unequivocal in its nature, as to require no time to warrant a presumption. (2 Hilliard on Real Prop. 77, § 22; Wyman v. The Mayor, &c., of New York, 11 Wend. Rep. 498, 500, 502; and other authorities hereinafter cited.)

No particular form, or ceremony, is necessary to the dedication of land to the public use; nor is it essential to the validity of a dedication, that the land should be in the actual use, or occupation, of the public; nor that the property claimed to be dedicated had ever been so used; or was in a condition so to be used. (Dummer v. Jersey City, 1 Spencer, Rep. 106–109; Barclay v. Howell, 6 Pet. Rep. 505; Wyman v. The Mayor, 11 Wend. Rep. 498; Rowan v. Portland, 8 B. Monr. Rep. 249, 250; Cincinnati v. White, 6 Pet. 440.)

Neither is a deed, or other writing, necessary to constitute a valid dedication of an easement. (Cincinnati v. White, 6 Peters, Rep. 437.)

Nor, like other grants, is there a necessity that there should be a grantee, *in esse*, capable of taking the subject-matter thereof. (Id.; Dummer v. Jersey City, 1 Spencer, Rep. 108; Pearsall v. Post, 20 Wend. Rep. 119.)

But when the town is incorporated, the corporation represents the public, or inhabitants of the town; and the rights of the public in such common property, are vested in the corporation. (Watertown v. Cowen, 4 Paige, Rep. 514; Dummer v. Jersey City, 1 Spencer, Rep. 108; Cincinnati v. White, 6 Peters, Rep. 439; Rowan v. Portland, 8 B. Monr. Rep. 238, 239.)

Passing by the first mode of establishing a dedication of land

to public uses, viz., by *user* for some length of time, which assumes an assent to such use on the part of the owner of the fee, as unnecessary to be considered here, inasmuch as we do not claim to establish the dedication by such mode, we proceed to the consideration of the other.   This consists of acts on the part of those claiming to be the proprietors of the soil, which are of so positive and unequivocal a character, as not to require any time to warrant a presumption of dedication of the *locus in quo* to public uses; and which, as we contend, by the incorporation of the town, became subsequently vested in the plaintiff for such uses.

It is laid down, that "where one lays out his ground into lots, and sells and conveys the same, fronting on, or bounded by, streets so laid out through the same, the easement, or right of way over such streets, passes as appurtenant to the grant, and vests in the grantees, in common with the public.   Such circumstances are *an immediate dedication* of the streets, unless as in the case of Underwood v. Stuyvesant, 19 Johns. Rep. 186, the streets laid out depend on a contingency, or are contrary to some local law.   The grantor cannot sell, or dispose of the ground, or use it for any purpose; he has no individual interest remaining, except the nominal fee in front of his adjoining ground not disposed of." (Wyman v. The Mayor of N. York, 11 Wend. Rep. 500; Livingston v. The Mayor, 8 Id. 85–105; Watertown v. Cowen, 4 Paige, Rep. 513; Barclay v. Howell's Lessee, 6 Peters, Rep. 498; Cincinnati v. White, 6 Id. 431; Conner v. New Albany, 1 Blackf. Rep. 44; Rowan v. Portland, 8 B. Monr. Rep. 233, *et seq.*)

It is not necessary that a plan of a town, laying down lots, and streets, &c., shall specify by words, what are the parts dedicated to the public use; it is sufficient if they be represented as streets, &c.   (Rowan v. Portland, 8 B. Monr. Rep. 246, 247; see also People v. Lambier, 5 Denio, Rep. 19; Comm. v. McDonald, 16 Serg. & R. 390–392; Augusta v. Perkins, 3 B. Monr. Rep. 437, 441; Bowling-Green v. Hobson, Id. 480, 481.)

Upon examination of the plan of the city of Galveston, which has been put in evidence, it will be seen, that the streets running north and south, by the plan, extend to and into the waters of Galveston bay, an arm of the sea, and a public highway; and there is nothing tending to show any limitation of the right to extend them, by natural accretion, or artificial means, to the channel of the bay, which is the limit on the northern side, of the tract described in the patent, so as to preserve always the communication with the navigable waters thereof.

There is no line dividing, or separating, the town from the land covered with water, which lies to the north of blocks Nos. 730 to 748, from 10th street to 29th street; nor is there any line closing the northern termini of the streets and avenues, which run north and south, from the bay to the gulf.

The northern boundary of the town, and of the ends of the streets, is the water of the bay of Galveston; and that the latter were to terminate in the waters of the bay, is a virtual and necessary consequence of their location on the plan; the object evidently being for the purpose of affording free access to the bay, for lading and unlading boats and vessels. (Rowan v. Portland, 8 B. Monr. Rep. 239, 247; Louisville v. Bank U. S., 3 Id. 144, 157; Giltner v. Carrollton, 7 Id. 680; People v. Lambier, 5 Denio, Rep. 19; Kennedy v. Jones, 11 Ala. Rep. 84, 85; Comm. v. McDonald, 16 Serg. & R. 390, 396; Barclay v. Howell, 6 Peters, Rep. 502.)

The dedication having been made by the proprietors, cannot be resumed again. (Cincinnati v. White, 6 Peters, Rep. 431; Rowan v. Portland, 8 B. Monr. Rep. 246, 247; Dummer v. Jersey City, 1 Spencer, Rep. 86; Wyman v. The Mayor, 11 Wend. Rep. 500.)

Where the inhabitants of a city constitute the public, to the use of which, the land was dedicated, an action to recover the possession of it is properly brought by, and in the name of, the corporate authorities. (Dummer v. Jersey City, 1 Spencer, Rep. 86; Watertown v. Cowen, 4 Paige, R. 514; Augusta v. Perkins,

3 B. Monr. Rep. 443; also Savannah v. Steamboat Co., R. M. Charl. Rep. 342.)

A right to the use, gives the corporation the right to sue. (Lewis v. San Antonio, 7 Texas Rep. 321.)

It was considered by the court below, that there was no proof of dedication of streets, or of the flats in front of the town; that the map on its face, shows a reservation to the proprietors, of the front of the actual survey; that it was so declared in all the deeds made for lots sold; and that such reservation was further confirmed by the continuous *user*, by the proprietors and their alienees, without objection by the corporation, or the citizens. That the court below grossly erred in this conclusion, will be apparent from an examination of the cases of Rowan v. Portland, The People v. Lambier, Comm. v. McDonald, Kennedy v. Jones, and others before cited. The facts show, that sales of lots were made publicly in 1839, and the right of the purchaser was evidenced by a certificate of purchase, which contained no reservation of any portion of the flats in front of the town. The deeds containing the reservation alluded to, were not made until 1840, and subsequently thereto. They were then executed, and substituted in the place of the certificates of purchase, whenever the holders would accept thereof; and some of the purchasers refusing to accept the deeds, retained their certificates, and still hold under them, as the evidence of their title. The reservation in the deed, was an afterthought, which will not avail to defeat the claim of a dedication, which became perfected upon the sale of the lots according to the plat, or plan, which was first exhibited in 1839, and vested in the purchasers, in common with the public. The *user* which is alluded to, as confirmatory of the alleged reservation, will be more fully considered hereafter, in discussing the questions arising under the plea of the defendant. It will be sufficient here to remark, that the public right to the use of the spaces designated, cannot be lost by any *non user* by the public; (See Dummer v. Jersey City; Barclay v. Howell; and other cases before cited;) or, by any long continued encroach-

ment by individuals. (See Arundel v. McCulloch, 10 Mass. Rep. 70 ; and other cases hereinafter cited.)

If the fact, of the dedication of the *locus in quo*, is successfully maintained, then it is wholly immaterial, so far as the present suit is concerned, whether Menard derived by the patent of the President of the republic, the title to the soil of the island below high-water mark on the bay of Galveston, or not; for, as we have seen, the dedication having been once made by the proprietors, cannot be resumed again, or granted to any one ; and the defendant, and those under whom he claims, took nothing by the conveyance to them, from the Galveston city company.

2d. We now proceed to the examination of the second position assumed, that of the direct grant from the state to the plaintiff; and of the defences which are set up against it.

Under this head, the plaintiff claims, under the Act of December 8th, 1851, by which the State of Texas grants to "the corporation of the City of Galveston, the power and privilege of opening all the streets, running north and south, on the bay side of said city, to the channel ;" and also grants "the power and right to erect wharves at the ends of such streets as they may deem proper."

And by section 3, power is given to "fill up such portion of the flats covered by water, between ordinary low-tide water mark and the channel, on the bay side, as said corporation may deem necessary for public purposes."

The amended answer of defendant, was filed November 23d, 1854, and the first clause, or plea, sets up that the grant to the city, of December 8th, 1851, by the legislature, is in violation of the Constitution of the United States, being in contravention of that clause, which denies to a state the power of passing any law impairing the obligation of contracts, because of an alleged previous grant, made by the Republic of Texas, to M. B. Menard, of the *locus in quo*, under whom defendant claims.

The second article, or plea, sets up the nullity of the grant, because, as it is alleged, it is in violation of the Constitution of the State of Texas ; the *locus in quo* having been granted to Me-

nard, as in the former plea is set forth.    It is alleged, not only to impair the obligation of the contract with Menard, but purports to authorise the corporation of Galveston to take private property, without the consent of the owner, and without adequate compensation being made therefor.

If the fact of a *previous valid grant*, by the Republic of Texas, to M. B. Menard, of the shore of the island of Galveston, including the *locus in quo*, be sustained, we fully concede that the grant to the corporation of Galveston, of December 8th, 1851, would be inoperative, for want of title in the state.    (New Orleans v. United States, 10 Peters, Rep. 731–734; Fletcher v. Peck, 2 Cond. S. C. Rep. 319-322; Terrett v. Taylor, 9 Cranch, Rep. 43; New Jersey v. Wilson, 7 Id. 164; University v. Foy, 1 Murphy, Rep. 58; Dartmouth College case, 4 Cond. Rep. 526.)

And unless the plaintiff has established the dedication to public uses, by the laying out of the town, according to the plat, or plan thereof, exhibited, and the sale of lots according thereto, previous to the conveyance of the Galveston City Company to Love, under whom defendant claims and deraigns his title, which is alleged to be of date of February 1st, 1845, then we shall as freely admit we present no case.

But was there a previous valid grant by the Republic of Texas?

The patent, or quit-claim deed, issued by the President of the Republic of Texas, and which bears date, January 25th, 1838, describes the league and labor of land, which the Act of December 9th, 1836, grants to Menard, as according to a survey which extends the northern limits, or boundary, below both high and low-water mark, to the channel of the bay, on that side, and includes the shore, or flat, on which the corporation of Galveston is authorised, by the Act of 1851, to extend streets, erect wharves, &c.

But this instrument derives all its force and effect, nay, its vitality, from the Act of Congress of the Republic of Texas, approved December 9th, 1836, which relinquishes, in favor of Menard and his associates, " all the right, title, and claim,

which the government of Texas has to *one league and one labor of land, lying and situated on and including the east end of Galveston island;*" and thereby "vesting the right, title, and interest, which the government of Texas now has in and to said land," in the said Menard and associates; and it is issued in pursuance of the authority given in and by the 2d section of the said act, which directs the president to issue to Menard and his associates, "a quit claim title to said land;" referring, of course, to the land mentioned and described in the preceding section.

Considering the Act of Congress of December 9th, 1836, as the grant *per se,* and the patent, or quit-claim deed, directed by the second section of the act, to be issued, to have been intended by the legislature as but one of the evidences of title, the first question which presents itself, is, what passed by said grant; the island of Galveston being surrounded by the sea, and by tide water, the bay of Galveston being an arm of the sea, in which the tide flows and reflows?

The only words of description, as to the subject-matter of the grant, are, "one league and one labor of land, lying and situate on, and including, the east end of Galveston island." Although, by the common law, the term *land,* is one of very extensive import, comprehending, says Lord Coke, in its legal signification, any ground, soil, or earth, whatsoever—as meadows, pastures, woods, waters, marshes, furzes, and heaths; and also an indefinite extent upwards, as well as downwards, (1 Inst. 4, a.; 1 Cruise, Dig. 45;) and it is conceded to be equally as comprehensive by the civil law; yet it is contended, that the shore of the island of Galveston, on the bay, did not pass by that term, but forms an exception to the general rule.

The *shore,* is that ground that is between the ordinary high-water and low-water mark, whether on the coast, or in the arms of the sea, such as bays, navigable rivers, &c., in which the tide flows and reflows; and it is a settled principle of the English common law, that the right of soil of the owners of land bounded by the sea, or on an arm of the sea, bay, or navigable stream,

extends only to the ordinary high-water mark; and that the shore belongs, *primâ facie*, and of common right, to the public; in England, to the king; and in this country, to the state; unless it has, by grant, become the property of individuals. (Hale, de Jure Maris, c. 4; see transl. in note *a*, to *Ex parte* Jennings, 6 Cowen, Rep. 536, *et seq.;* 1 Crabb, Real Prop. §§ 105, 106, 107; Woolrych on Waters, 25–28, 433, *et seq.;* 3 Kent, Com. 427; Rex v. Smith, Doug. Rep. 446; Carter v. Murcot, 4 Burr. Rep. 2162; Storer v. Freeman, 6 Mass. Rep. 435; Cortelyou v. Van Brundt, 2 Johns. Rep. 362; Hagan v. Campbell, 8 Porter, Rep. 9, 24; Gough v. Bell, 1 Zabriskie, Rep. 157; Arnold v. Mundy, 1 Halst. Rep. 67.)

By the civil law, the sea shore included the land, as far as the greatest wave extended in winter; and was said to be public, as far as the place where the highest tide rises. There is also the additional servitude of a towing path, on each side of navigable rivers, for the benefit of the public. (1 Bouv. Inst., Art. 440; Inst. of Justinian, book 2, tit. 1, § 4; 2 Domat, (Strahan's ed.,) 385; 3 Burge, Com. 417, 418; Grotius, de Jur. 60–62; Wood, Inst. 81, 83.) By the law of Spain, the shore of the sea includes whatever part of it that is covered with water, whether in winter or summer; (1 White, New Recop. 70;) and by the civil code of Louisiana, it is that space of land over which the waters of the sea are spread in the highest water, during the winter season; (Art. 442;) and by both codes, subject to the servitude of a towing path on the banks, &c., though the property of the banks may be in individual proprietors of adjacent lands. (White, New Recop. 70, 71; Civil Code Louisiana, Art. 444, 446.) The diversity existing between the common law and the civil law, and the various codes founded on the latter, being that the rule of the former is more favorable to the grantee of lands on tide waters.

It may be urged, however, that the league and labor of land is not, in the grant, bounded or limited, in express terms, by the waters of the gulf or the bay; and that from the generality and comprehensiveness of the term land, the grantee might locate a

part on the shore of the bay. It is true, that such boundary is not given by express terms, yet, it is contended, that it exists by irresistible and necessary implication. If the whole island had been granted by the simple description of " the island of Galveston," and which would have been all that was necessary to have passed the right thereto, no one will seriously contend, that the shore lines of the gulf of Mexico on the one side, and the bay of Galveston on the other, would not have been the legal boundaries of the grant, as fully and completely as if they had been specified therein; and which, according to the authorities before cited, would have carried the grantee's right, only to the high-water mark. Then, where is the difference, when a certain quantity of land, " lying and situate on the east end" of the island, is granted? Will not the same implication and inference necessarily arise, that the portion granted, is limited and bounded by the shores of the gulf and of the bay?

For other reasons, springing out of the character of the grantor, and the subject-matter of the grant, it would seem, that from the generality of the term used, the shores of the island did not pass to the grantee, Mr. Menard; that to pass them required special and particular terms, the intention to do so, to be clearly and indisputably expressed.

Grants from the crown, or government, are to be construed most favorably for the grantor, and strictly against the grantee; nothing will pass by implication, or intendment; thus reversing the rule of law, which is applicable to grants and deeds between individuals. (2 Black. Com. 347; Case of Willion & Berkely, 1 Plowd. Rep. 243; Leicester's case, Dyer, Rep. 362 a; Castle v. Hobbs, Cro. Car. 21, 22.)

It is said, that there is an exception to this rule, when the grant is upon a valuable consideration, in which case, the same rule is alleged to obtain, as upon a grant, &c., between individuals; and a *dictum* of Sir Edward Coke, in a note, or comment, on his report of the judgment in Sir John Moulin's case, 6 Co. Rep. 6, is cited to support the exception; the correctness of which is however denied. But if such an exception to the

general rule does, or ought to, prevail, when the subject-matter of the grant is of a *territorial*, as distinguished from a *prerogative* right, yet, where the subject-matter of the grant itself is of the latter character, or prerogative rights are claimed to be conveyed thereby, the integrity of the rule has never been disturbed. Thus, it is laid down, that general words in letters patent, never extend to a grant of things which belong to the king by virtue of his prerogative; therefore, mines royal, amercements royal, or escheats royal, will not pass by general words of "all mines, amercements, or escheats." (Case of Mines, 1 Plowd. Rep. 333, 337; Case of Alton Woods, 1 Co. Rep. 46 b, 52 a; Case of River Banne, Dav. Rep. 155, cited at large in 5 Cruise, Dig. (Greenl. ed.) 46, 47. ·

The principal rule has been thus vindicated by Lord STOWELL: he says, "Against an individual, it is presumed, that he meant to convey a benefit with the utmost liberality, that his words will bear. It is indifferent to the public, in which person an interest remains, whether in the grantor or the taker. With regard to the grant of the sovereign, it is far otherwise. It is not held by the sovereign as private property; and no alienation shall be presumed, except that which is clearly and indisputably expressed." (The Elsbee, 5 Rob. Adm. Rep. 173, 183.) It has also been recognised and acted upon in other modern cases in the English courts, from which we cite the following: Stourbridge Canal Company v. Wheeley Canal, 2 B. & Ad. 793; Rex v. Capper, 5 Price, Exch. Rep. 217. And in the following American cases: Jackson v. Lamphire, 3 Peters, Rep. 289; Prov. Bank v. Billings, 4 Id. 514; United States v. Arredondo, 6 Id. 738; Charles River Bridge Company v. Warren Bridge, 11 Id. 420, 545; Martin v. Waddell, 16 Id. 411; Hagan v. Campbell, 8 Porter, Rep. 9; Mohawk Company v. Utica Company, 6 Paige, Rep. 554.

The right of the sovereign to the soil of the sea-shore, and of all navigable waters, where the tide flows and reflows, is a prerogative right; and it is thus vested, because it is essential and important to the public welfare, that the government should be

endowed with such a right of proprietary. It may be, and originally was, both a territorial and prerogative right. (Woolrych on Waters, 433, 450; Bac. Abr. tit. Prerog. B. 3; Martin v. Waddell, 16 Peters, Rep. 413.)

Until granted, the sovereign power holds the right, both to the water and land under the water, for the public use; and the right of passing and repassing, navigation, fishing, &c., &c., are common to all the citizens, subject of course to such regulations as may be imposed for the general benefit. (Comyn, Dig., Prerog. D. 50; 3 Kent, Com. 412, 414, 417, 418, 425, 427; Arnold v. Mundy, 1 Halst. Rep. 71; Martin v. Waddell, 16 Peters, Rep. 411; 2 Domat, 381, 385; Bowyer, Pub. Law, 362, 363; Gough v. Bell, 1 Zabriskie, Rep. 160.)

The defendant also pleads actual possession for five years, prior to the commencement of this suit; paying taxes thereon, and claiming under a deed, duly recorded, &c.

This plea, it is presumed, is under the 16th section of the act of limitations of February 5th, 1841, and to which several answers may be made.

1. If the shore of the island was not conveyed by the government to Menard, but remained in the state, up to the time of the grant to the plaintiff, by the Act of December 8th, 1841, then, inasmuch, as by the express terms of said section, it did not bar the right of the state, the bar could only commence, if at all, from the time of the grant to the plaintiff, (8th of December, 1851,) and the time had not run when the suit was commenced. (Hart. Dig., Art. 2292; Chiles v. Calk, 4 Bibb, Rep. 554; Campbell v. Thomas, 9 B. Monr. Rep. 82, 84.)

2. If the *locus in quo* did pass from the republic of Texas to Menard, and was by the founders of the town of Galveston, by the plan thereof and sale of lots, dedicated to public uses, then the statute did not run against the plaintiffs, because the property was not the subject of alienation. (3 Cruise, Dig. 454; 2 Watts, Rep. 26; 16 Serg. & R. 401.)

3. The patent being, as we contend, void for want of authority in the president, it cannot be the foundation of an adverse

possession. (Doe d. Walker v. Turner, 5 Peters, Cond. Rep. 668; Powell's Lessee v. Harman, 2 Peters, Rep. 241.)

Lapse of time cannot render an act valid, which was originally void. (Holyoke v. Haskins, 5 Pick. Rep. 20, 27.)

*W. P. Ballinger*, for the defendant in error.—As to the character of land covered by tide water, and whether it is to be held by the general law in this state, an incident to front proprietorship, or reserved to the state, we have already presented our argument, which, if sound, concludes the case on that head. But, waiving that, we assert the claim to the flats, as within the legislative grant, by reasonable and necessary construction.

That it was competent for the legislature to grant the flats to Menard, cannot be contested. The question is, are they within the intention and proper construction of the grant. And here, the necessity of a different rule of construction in this country, from that applied in the English courts, to the same subject-matter, is apparent. There the crown held such land as part of the prerogative, *in trust for, the public*. Here the people, the sovereignty, constitute the public, and hold them absolutely in their own right.

Says TANEY, C. J., in Martin v. Waddell, 16 Peters, 410, 411: "A grant made by their authority, must, therefore, manifestly be tried and determined by different principles from those which apply to grants of the British crown, where the title is held by a single individual, in trust for the whole nation." (And see Id. 411, 412.)

In this case, the people of Texas were the proprietors of Galveston island, as well the flats, as the dry land, by the same title. They held either, absolutely,—their ability to grant either, was the same. When they grant, by the expression of their own will, through the appropriate channel, there are no trust rights behind, to limit or restrict their act, and call, in order to protect such rights, for any strictness of construction. Their grant must receive its fair and reasonable interpretation, in order to give effect to its object.

The argument of the plaintiffs, then, rests on the term, "island:" that the flats, between the ordinary high-water mark and the channel, though frequently left entirely bare, were not part of the island. On this narrow quibble alone, do they stand.

It is not deemed necessary, to enter into any critical argument on the literal and precise meaning of the word, "island." we feel, that we should poorly appreciate the understanding of this court, and the spirit with which they will consider this case, if we supposed much weight would be given to such a discussion. Still, we do not avoid it. But we know that the court will consider the object of the grant; the intention of the parties; will look at the whole scope and design of the law; at the construction then given, and long received; and will apply that reasonable and just interpretation, which will effectuate the intention and spirit of the grant.

An "island," is defined to be "a tract of land, surrounded by water." But in its enlarged sense, it includes all that is appurtenant to a large country, which may be formed by an island. Thus, the bays, harbors adjoining small islands, &c., are considered as part of the islands of Borneo, New Holland, &c. (See American Encyclopædia, "Island.") So, it is applied to floating masses of ice, or loose earth, timber, &c.; to the coral reefs of the ocean; to sand-banks, reefs, &c., entirely under water, but not covered to any considerable depth. So to what is, in fact, a peninsula, and not surrounded by water.

But the precise point here is, as to the *sea shore*. The space between the *highest* and *lowest* water-mark, at the civil law, was the sea shore. The lowest water-mark occurring regularly and periodically, as shown by the testimony in this case, extends to the channel, and that is the space, or ground, in controversy here. What rules apply to the shore?

In Sir Henry Constable's case, 5 Rep. 107, it was resolved by the whole court, that "the soil upon which the sea doth ebb and flow, to wit, between the high-water mark and low-water mark, *may be parcel of the manor of a subject*, and when the

sea doth flow unto the full height, the admiral shall have jurisdiction; but of anything done upon the ground, when the water is returned, the common law shall have jurisdiction, *for it is then a parcel of the county.* So that, between the high-water mark and low-water mark, the common law and the admiralty shall have severally power, interchangeable as aforesaid." (2 Brown's Admiralty and Civil Law, 92 ; Woolrych on Waters, 6.)

Callis, an ancient writer on sewers and waters, says: " The sea shore is not all one with the sea, nor with the land; but it participates with them both." And this is quoted as the correct description of its character, by the latest writer on the subject. (Woolrych on Waters.)

Many cases may be cited, to show that the sea shore has been held parcel of adjacent manors, and in which the circumstances to raise the construction, fell infinitely below those applying in this case. Thus, Lord HALE, in his day, (De Jure Maris, 27,) says of the shore : " It may not only be parcel of a manor, but *de facto*, many times is so ; and, perchance, it is parcel almost of all such manors, as by prescription have royal fish, or wrecks of the sea, within their manor. * * * * These are perquisites, which happen between the high-water and low-water mark. He, therefore, that had *wreck of the sea, or royal fish*, by prescription, *infra manerium, it is a great presumption that the shore is part of the manor, as otherwise he could not have them.*"

If, then, this had been a grant of this league and labor of land, *with the right to take wreck, or royal fish*, the flats to the channel would have passed, clearly. It would have come up to the ideas of our opponents, of the certainty by which *jura regalia* can be transferred.

But it is a grant to build a city, where the custom house of the republic was to be established, and its commerce carried on, and these flats were indispensable for this object, as the petition and legislative act clearly show. What is the *principle* of the inclusion of the shore ? The quaint words of Lord HALE, above

quoted, express it with the distinctness of volumes, "*otherwise he could not have them.*" Grant that, which fairly and reasonably requires the shore for its enjoyment, and it will pass.

Duke of Beaufort v. Mayor, Aldermen and Burgesses of Swansea, 3 Exch. Rep. 413, was an ancient grant of "*terra de Gower*," and under this, the sea shore was claimed. The report says that the evidence of many acts of ownership to low-water mark, in modern times, was adduced, and it was referred to the jury to say whether the sea shore was part of *terra de Gower.* The court, in approving this direction of the judge, say : "There is a grant of the seignory of Gower. What is the seignory of Gower?" The learned judge says, you cannot define it from those words merely. But, if by usage, "which is so long standing, that we may presume it to be contemporaneous with the grant itself, the sea shore in question has always been considered to be part of Gower, then you will take the grant and the usage together, * * * and looking to the grant, coupled with the usage, you are to form your opinion. I think that direction is correct." (Id. 424.)

" All modern usage is evidence, to show what was the meaning of the grant." " I think the jury were properly instructed to inquire from modern usage, whether the limit of terra de Gower was or not, the low-water mark of the sea shore." (Id. 425.) ALDERSON, B., says : " It is quite clear, that a subject may hold not only the lands granted between high and low-water mark, but he might have held *below low-water mark.*" (Chad v. Tilsed, 2 Brod. & B. 406 ; 6 Eng. Com. Law Rep. 171.)

A grant of wreck was made by Henry II., to the proprietors of the island of Brownsea; and acts of ownership, for a period of forty years, over a small bay, left almost dry at low water, and consisting of sea mud, having been proved, the bay was held within the grant. DALLAS, C. J., says : " The grant of Henry II. conveys the island of Brownsea and *its shores,*" (meaning, by *shores,* merely the effect of the grant to *take wreck.*) " What, then, are its shores ? What, usage has pointed out ? And if I find the usage such as existed here, how can I resist the evidence ? It is

urged that this is only a *grant of wreck*, but wreck must *rest on the soil*, and usage must determine what has been deemed soil; and it was held, that the usage was 'the strongest exposition of the meaning of the original grant.'" (Chad v. Tilsed, *supra*.)

Calmady v. Rowe, 6 Man. Gr. & Sc. 861, was a grant of a manor, with wreck of the sea and several fisheries, but not purporting to convey the shore. The taking of sand, sea weed, &c., by plaintiffs and their tenants, for forty years, was proved. (See evidence as to this, Id. 877.) And it was held "conclusive, to show that the soil of the sea shore was granted to those under whom the plaintiff claimed." (Id. 893.)

Lopez v. Andrew, 3 Man. & Ryl. 329, a, cited in the note to Calmady v. Rowe, 60 Eng. Com. Law Rep. 893, (the only place we can find the case,) involved title between high and low-water mark on the river Tary. And the court instructed, "although *primâ facie* in the crown, that evidence of enjoyment by the owner of the adjoining manor would justify the presumption of a grant from the crown, and although the spot in question appeared to fall within the terms of the parliamentary grant to the Black Prince, and therefore to be inalienable, yet the jury were at liberty to presume a statute granting the land between high and low-water mark, to some former owner of the plaintiff's manor." The jury found in favor of the grant, and held that the instruction was correct in point of law. The report says, "Contradictory evidence was given as to the enjoyment of the *locus in quo*, which on both sides was very slight."

These authorities show, that the shore is neither, strictly speaking, nor at all times, land, nor is it water. At times it is each, and at all times may be said to participate of each. By the theory of the English law, *primâ facie*, it belongs to the crown; but Sir Matthew HALE said, in his day, "it was commonly part of the adjacent manor;" and PARKE, B., said, in 1849, that "in point of practice, the sea shore is taken and treated as part of the adjoining-manor."

We have seen, that a grant for such purposes as legitimately

require the use of the shore, as to take wreck, &c., raises strong presumption of a grant to the soil: and acts of claim and ownership of the shore, under such grants, are received as affording conclusive presumption, that the grant does include the shore.

We may admit, without hesitation, that it is not strictly accurate and literal, to regard the shore and its flats, in the full sense of the word, as an "island," though we claim, and have shown, that at times it is strictly applicable, and at all times partly so. But it is clear, that it is a term ample enough to let in the construction of the *object* and *intent* of the grant, and the usage under it. And so we say in this case: keeping in view the object of the grant, apparent on its face; keeping in view the alternative presented in its construction, viz., between the highest and lowest water mark; the former of which would entirely defeat and nullify the grant, the latter carry out its design; the contemporary construction, and long continued acquiescence; there can, we think, be no possible question as to the sufficiency of the description to include the flats.

Many cases might be cited, in which terms not literally fitting the object of a law, have been construed, either liberally or strictly, in order to fulfil its object, and give effect to the intention of the parties, and the justice of the case.

Thus, with reference to this very term. Brink v. Richtmyer, 14 Johnson, 256, was an action of trespass, claiming under a patent for an island, commonly called and known by the name of Green Flats, containing forty acres. The court say: "The land claimed under this patent is *usually* covered with water, and could not, therefore, *in strictness*, be called an *island*. But they say it was also called Green Flats; there was no doubt it was the land intended, and was sufficiently described." This case shows that courts will look *through* the terms, to the real object of the grant, and give it effect, although the terms may not be strictly appropriate.

Lodge's Lessee v. Lee, 6 Cranch, 237, was a grant of all that tract or upper island, called Eden, in Prince George's county, beginning at a bounded maple, and giving metes and bounds,

which did not include a part of the island : but held, that the intention was to pass the whole island; that term alone being sufficiently descriptive. (Handly's Lessee v. Anthony, 5 Wheaton, 374.) The state of Kentucky owns the entire bed of the Ohio river, and the islands between that and the Indiana shore, and the question was, whether a tract of land in the river was an island, and consequently belonged to Kentucky. It was near the Indiana side. The main channel was between that and the Kentucky shore; and, between it and the Indiana shore, was another channel, through which the water, when at its height, run forty and fifty feet deep, but at extreme low water, did not run at all, leaving it eight or ten feet above low-water mark. The court below decided that it was not an island, unless surrounded by water at low-water mark, and Chief Justice MARSHALL said : " We are not satisfied that this definition is incorrect, as respected the subject before the court;" that is, that land, unless permanently surrounded, remained a part of the main land, and not part of the river. " Is there any safe and secure principle on which we can apply a different rule to land which is sometimes, though not always, surrounded by water ?" was the language of the Chief Justice; and it evident that he looked at the *main question*, which was to determine what was land, and what was water, for the purpose of a great object— the establishment of a boundary between the states.

The spirit of this reasoning seems well applicable here. · Here is a grant of land on Galveston island, for a city. The flats are regularly and periodically left bare, dry land, to the channel. For the object of the grant, they were not only convenient and useful, but essentially necessary. At such times, they are, unquestionably, part of the island; and the convenient and proper rule, therefore, is to consider them a continuation of the land or island within the intendment of the law.

McMullen v. McCullough, 2 Bailey, 346, was a grant to a company, for opening the Catawba river, of all lands within two miles of said river. The question was, whether this included islands in the river. The Supreme Court say : "The islands

would seem to have *more immediate relation to the object of the grant*, than lands at a distance from the river." And they were held to pass.

Our own reports furnish us with a strong case, in which the intention and policy of the legislature were carried out, against the literal import of the words used with respect to *the islands*. The islands had been reserved from location, and afterwards, all laws on the subject of the public lands were repealed; and the point was, whether this repeal included also a repeal of the reservation. It was admitted, that if the words were *literally* construed, a repeal took place, but the intention and policy of the law were considered. "If," says the special judge, "the literal expressions of a law would lead to absurd, unjust, or inconvenient consequences, such constructions should be avoided." And it was held, that the islands, though vacant and belonging to the state, were not, in the sense of the law, public lands. (State v. Delesdenier, 7 Texas Rep. 76.)

With this decision before us, as to the duty of such construction, as, without regard to the precise and literal import of the words, shall give effect to the apparent intention and spirit of the law, is it not shameful, that in a grant made by the government, of part of the island, for the building of a commercial city, a rigid, literal signification of the word should be insisted on, to the exclusion of the main purposes of the grant, to the denial of a construction made contemporaneously by the authorities of the state, and acquiesced in for fifteen years, and to the overthrow of the numerous and valuable rights acquired during that period?

Lessieur v. Price, 12 Howard, 59, is an instructive case, to show the manner in which courts should construe a grant for laying off a town. In the act admitting Missouri into the Union, in 1820, it was enacted, that "*four entire sections* of land be, and the same were thereby granted, to the said state, for the purpose of fixing the seat of government thereon." This grant was located on "fractional sections 6, 7, 8, entire sections 17 and 18, and so much of the north parts of sections 19 and

20, as would make four sections in fractional township 44, south of the Missouri river," &c. The objection was made, that the law granted "entire sections in a square form, and intended to exclude fractional parts of sections, and, as this controversy involved a fraction, no title was taken by the state of Missouri." (12 Howard, 77.) "If," said counsel, "this grant had been of *sections*, the purpose would be manifest, but a grant of four *entire sections* was enough to preclude the possibility of a doubt as to the legislative intention." (Id. 71.) And the decisions were cited, by which locations made otherwise than as prescribed by congress, were pronounced void. The Supreme Court of the United States, say: "This objection is plausible, but, we think, unsound. * * *The object of the grant was a city site, for a great political purpose;* that the seat of government would be established on the Missouri river, was almost certain—a fact that could not have been overlooked by congress. *To a metropolis, the river-front was absolutely necessary.* If the land was selected adjoining the river, fractions must necessarily be taken; and, therefore, *the act of congress cannot be construed, in the restricted sense contended for, without violating a leading object of the grantor and grantee.* Nor does it seem to have entered the minds of either, that a selection of fractions violated the terms of the grant. From first to last, for nearly thirty years, has the grantor *acquiesced.* Nor do we think that the *validity of the selection can be called in question by an objection never set up by the United States.*" (Id. 77.)

One more view of this grant. Some decisions have held, that the king's grants and patents were to be taken most strongly against the grantee—the terms employed being considered as the suggestion of the grantee. Besides, the king's grants and letters patent are carefully framed, in legal language; and it may well be held, that they should receive a strict and accurate construction.

But this is not the rule for construing statutes or laws. The words employed by the legislature, unless they are technical in their character, are not to receive a precise, literal, technical

meaning, but their meaning according to common usage. They are made not for professors or lawyers, but for the people at large, and in the sense of the transaction of ordinary business; and such interpretation is to be given, as would be placed by common usuage, with reference to the object of the law. Nor is it so much etymological propriety, nor even in popular use, that the meaning of particular words is to be found, as is in the subject or occasion in which they are used, and the object that is intended to be attained. (Broom's Leg. Maxims, 536.)

What was the character of this transaction? Col. Menard wished to purchase the present site of the city of Galveston, for the purpose of laying off, and establishing a city. He applied to the legislature, then in session, for a league and labor of land, on and including the east end of Galveston island, for this purpose. The government, in effect, say: "We are in the extremest need of funds; all our resources, the islands, &c., are to be made available for our present exigencies." (7 Texas Rep. 103.) "Our object is, to realize the largest possible amount for the city site, which we deem of great value. We will sell it to you for $50,000. For this price, we relinquish all the right, title and interest of the State of Texas, in the premises, except alone a reservation of fifteen acres, on the extreme east end of the island, and a single block in the city, for a custom-house, and other public purposes; and the president shall make you a deed for the land."

Keeping in view this "leading object, both of the grantor and grantee," (12 Howard, 77,) the building of a commercial city, can any doubt arise as to the real intention and proper construction of this purchase?

The legislature said, "Go and build your town on the east end of Galveston island." That the shallow flats, often bare; their occupation absolutely essential to reach the channel; their use necessary to protect the entire property, (as the petition shows,) were valuable, important and essential to this object, was self-evident. The first improvements to be made, were a wharf, to reach the channel, and warehouses projecting upon the water

lots.  There could be no doubt as to this.  There could be but one opinion as to where and how the town should be laid off. There was nothing latent, doubtful, or apparent, except to acute judgments, as to the necessity of the flats, and of that ground, (in the language of the petition,) now frequently flooded with the waters of the bay.  Every man that landed here, or attended the sale of lots, saw at a glance, that there was the heart of the city; there its leading merchants would build, and the most valuable investments would be made.

But, argue the other side, your city, by the legislative act, was to be on the east end of Galveston island.  *Is not that just the location, expressed in the identical words, which every man then, which every man now, would give to the actual site of this city?*  Has there been a man from that day to this, who, in describing the site of the city of Galveston, has said other than that it was on the east end of Galveston island?  *Who has ever separated in his mind between the island and the flats? And described the city as partly on Galveston island, partly in Galveston bay?*  Would it have occurred to Col. Menard, for instance, after obtaining his patent—in making his advertisements of sales of lots—resorting, it may be, to newspaper puffs, and eulogies upon the great bargains he could offer; seeking to attract purchasers of all classes for investments in this commercial enterprise, to describe his town as located otherwise, or including any thing further, than the east end of Galveston island?

Suppose persons drawn here for purchases, on the east end of the island, would there have been a surprise, a doubt suggested to their minds, when the water lots were offered for sale, at the idea that they were off the island and upon the flats?  On the contrary, those lots first and always have commanded the highest prices.

Your honors will hear the elaborate arguments made, in this case, on the other side; and the distinction claimed by them between the flats, and the east end of the island, will be presented to your minds.  But we appeal to you, whether, hereafter, in

thinking or speaking of our city, any other locality will suggest itself to you, than the east end of the island?

Are you capable of any other natural, practical thought on the subject? In describing it to a stranger, if the precision, which their speeches alone suggest, of an independent mention of the flats, should occur to you, would you not reject it as refined, technical, and unnecessary to the sense?

We most respectfully urge, that this point of view is proper to the consideration of this grant, and is quite decisive of its construction.

The legislative act, in favor of Col. Menard, was to be read, not with the precision of an orthœpist, or the fault-finding astuteness of a lawyer; but according to the plain understanding, the common-sense, the common usage of every day, practical, business men. And if the spontaneous, ready location, which all persons give now, and have always given to the city of Galveston, is, that it is upon the east end of Galveston island, the proposition is sound in law, that in the grant for the laying off and building up of this city, the same description was sufficiently definite and accurate.

The construction of the legislative grant, in favor of Menard, and its subsequent recognition by the legislature, are not, we think, at all weakened by the passage of the legislative act of December, 1851, under which plaintiffs claim.

That act is a mere grant of power to the city, to extend the streets to the channel, and build wharves at their end, and to fill up such parts of the flats as they shall deem necessary for public purposes. It does not purport to convey or relinquish any title to the flats. It does not intimate that the flat is public property. On the contrary, the intendment from the act, and the construction which would be given to the reading of it, would be, that it undertook merely to give the corporation authority to extend the streets over private property, and that the filling up of the flats was a sanatory measure, or measure of police, for the city, not contemplating at all the donation of the title to the property,

The language of the act is most unapt for any conveyance of the property, or dedication of it by the state, as it is construed on the other side.

No doubt the state had the power to authorise the extension of the streets; but whether the proper guards are provided, in this law, for compensation to the owners of the property, will be a very different question. It is not one necessary to discuss here. Nothing is more frequent, in cities, than the extension of streets, or other appropriation of private property for the purposes of the public. But the laws by which this can be done, must secure protection to private rights, and compensation to the owners.

Such, also, seems the purview of the provision as to the flats. There was already a city ordinance, by which the owners of lots could be required to *fill them up*, or it could *be done by the city, at the owner's expense.* (See Ordinance to provide for the security of the Health of the City, &c., March 9th, 1846, sec. 2, p. 30, printed ordinances.)

The validity of this ordinance had never been tested, and only applied to *lots*, and whilst we can well conceive that the legislature may have supposed that important public purposes, the preservation of the health of our city, &c., might be subserved by filling up parts of the flats, yet the authority of the corporation, under its charter, to do this, and the justice and expediency of imposing it on individuals, were questionable; and hence the power was given.

To constitute a dedication, there must be a clear and unequivocal indication of the intention of the owner. It all depends on his intention. It must be his will and object to dedicate. (Cincinnati v. White, 6 Peters, Rep. 435; 1 Ashmead, 417.) Laying out blocks fronting on the water, repels the presumption of dedication. (Rowan v. Portland, 8 B. Monr. 252.) So, although a street which is public, appears as the front of the plat, yet if limited by a line, it will repel the presumption of dedication beyond. (Barclay v. Howell's Lessee, 6 Peters, 504; Wood & Mansell, 3 Blackf. 129.) The plan of Madame Dehord,

leaving an open space between New Levee street and the river, was not a dedication of this space to public use. There was nothing marked or written on it, indicating an *intention* so to dedicate it. There is no particular form necessary to a dedication of land to a public use; but it requires the assent of the owner, and the fact of its being used for the purposes intended. (Municipality No. 2, v. Orleans Cotton Press, 18 La. Rep. 122; Carrolton R. R. Company v. Municipality No. 2, 19 Id. 71.) Where an open space was left for access to a river and wharf, on which the public passed for twenty or thirty years; but the wharf also belonged to the owner of the open space, and the open space was for his own convenience; held no dedication. (Irwin v. Dixion, 9 Howard, 10, 30, *et seq.*)

In all the cases, in which the dedication has been attempted to be made out by maps or plans, it has been held, that parol evidence was admissible to explain the map, and determine whether or not there was a dedication.

The parol evidence in this case, leaves no possible doubt as to the intention of the city company. The claim of the city to the channel, its possession and control over the whole extent, sales to purchasers, and occupancy by its vendees of the flats, have been continuous, notorious, and uninterrupted. No claim has ever been heard of, on the part of any other person or authority.

The city has received taxes for this property from the city company, until the passage of the Act of 8th December, 1851, when it refused to receive them further.

The title of the wharf owners is clearly recognised in repeated ordinances of the corporation. (See Ordinance, March 19th, 1846, p. 31, § 3. Printed Ordinances, concerning harbor master, p. 40. Supplementary to last, p. 81.)

The legislative act of December, 1851, under which they claim, estops the city from setting up a previous dedication.

Even if there was any dedication of the flats, the possession and use have been adverse to it for more than ten years before the institution of this suit, and limitation bars the public.

(Rowan v. Portland, 8 B. Monroe.)    In 18 La. 228, the court say: "In most of the seaports of the Union, it is believed, the wharves are private property."

We will now specially notice the question of dedication of the streets north of avenue A, involved in the Luffkin case.

On this we say, first, that there is no averment of any such dedication in the petition.   If a dedication had been relied on, it ought to have been distinctly alleged.   The word is not used; the equivalent idea is not expressed.   If it be insisted, that averments, equivalent to a dedication are made, then we say that it is not of a dedication by force of the publication of a map or plan, laying off streets, &c., and sales with reference thereto, but it is a dedication by *user*.   Appellants in their argument, show correctly, that there are two modes of dedication above mentioned.

Now, it is very clear, that this petition contains nothing about any acts by the original proprietors of the town, establishing the streets on its plan.   But their allegations, with respect to the existence of streets, are confined to the *user* of the streets, by boats, carts, drays, &c.

We say, then, that there is not one particle of any such proof as is averred in the petition; not the first fact in evidence of any such user, as they allege.   Their proof of dedication must have conformed to their allegations.   This is an elementary rule in all courts, and fixed in this; and they cannot be permitted to turn round upon us with this map, which was legitimate evidence in the case, and say, that it also *proves a mode of dedication not alleged*.   The whole argument and case of the plaintiffs on this head, is evidently an after-thought.

But we say, secondly, that the evidence is conclusive to show, that the streets did not extend further than they are plainly laid down, *as streets*, on the map, unless the extension has been effected by the legislative act of December 8th, 1851, and the ordinance since passed for that purpose.

1st. The legislative act proves this.   (Sect. 1, page 19.)   It

gives the corporation the power and privilege of *opening* the streets running north and south, on the bay side of said city, *to the channel.* The corporation cannot say, in the face of this, that these streets were already *opened,* and we presume that no quibble can get around the word " *opened.*" The legislative act is evidence against the corporation.

2d. The ordinance passed by the corporation, January 31st, 1852, proves still more strongly, that no such idea was ever before entertained. It ordains, "that all streets and avenues * * * *as laid down on the map* made by or for the Galveston City Company, were *thereby extended* and opened *to the channel,* * * * and each of said streets and avenues, were thereby made and declared an *open and public highway throughout its entire extent to said channel,* running in the same line of direction, and of the same width, including sidewalks, *as said streets and avenues now are.*" Can the corporation now pretend to say that those streets already extended to the channel?

3d. The agreement of facts in this case, (made out before this discovery of a dedication,) admits that the map delineated the plan of the city correctly, as to *location of streets,* and that the streets shown by the map have continued public streets, &c. This evidently means, that the *actual streets* shown by the map, are the actual and only streets of the city; and it excludes the fact and the argument, that the streets can be located constructively, otherwise, than as there actually delineated.

4th. The testimony is complete to show, that no dedication or extension of the streets was ever made or intended, unless prospectively, as a matter of future choice, beyond the point at which they appear on the map.

The map itself furnishes conclusive evidence of this. The streets were laid out and dedicated to and into the water, as far as lots for sale were surveyed, and no further. Beyond this line, was *wharf property.* Its only utility and value, and the only purpose for which it has been sold, is for the *erection of wharves.*

Nothing is better settled, than that the dedication of a public road or street, to a navigable highway, is not a dedication of the right to erect a ferry or wharf, at the end of such road or street, but those rights remain in the original proprietor. (Chambers v. Furry, 1 Yeates, 167; Cooper v. Smith, 9 S. & R. 32, 33; Chess v. Manown, 3 Watts, 219; Pearsall v. Post, 20 Wendell, 131–133, reviewing all the authorities; City of Boston v. Lecraw, 17 Howard, 426.)

"From the very nature of wharf property, the *access must be kept open* for the convenience of the owner and his customers; but no one ever supposed that the property *thereby became public instead of private*, and especially under such numerous and decisive circumstances as existed here, rebutting such an inference." (Irvin v. Dixion, 9 How. 33.)

But, whether or not, there was a dedication and its extent, is a question of the intention of the original proprietors, as to which parol evidence is admissible. The evidence of an announcement, that the survey was incomplete, and *of a right* to lay out blocks, &c., with *corresponding streets and alleys*, made at the sale, is conclusive. This shows that the streets were not considered to extend beyond the then survey, and could be extended as the survey of blocks was extended. This was a reservation, not a dedication. (Borden v. Manchester, 4 Mason, 112; Ward v. Davis, 3 Sandf. S. C. Rep. 502; Pitcher v. New York and Erie Railroad Company, 5 Sandf. S. C. Rep. 587; United States v. City of Chicago, 7 Howard, 195, 196.)

The city company, has ever since held possession and control of the entire flats. They have made repeated sales of the ground in front of the streets, for wharf privileges. Thus, the front of Twenty-fourth street, north of avenue A, was sold to McKinney and Williams, November 23d, 1844; the front of Seventeenth street to Reed, May 28th, 1838, afterwards exchanged to front of Eighteenth street; front of Twentieth street, December 27th, 1844; front of Bath avenue or Twenty-fifth street, *locus in quo* in Luffkin's case, May 20th, 1844;

front of Twenty-sixth street, November 23d, 1844; front of Twenty-seventh street, May 4th, 1846; front of Twenty-ninth street, November 23d, 1844; west half of Twenty-third street, May 10th, 1847; front of Nineteenth street, March 31st, 1851; and front of Seventeenth street.

*Allen & Hale*, also, for defendant in error.—I. As to the denial of the plaintiffs' right of action. The case made for the plaintiffs rested, as has been shown, first, on an assumed dedication of Bath avenue, to the channel, for public purposes; secondly, on the Act of December 8th, 1851. Now, to rebut the evidence of the dedication, on the part of the city company, the defendant showed, that the streets running north towards the channel, did not extend beyond the half block, laid off on avenue A; that the ground beyond, to the channel, on a line with the streets, had never been reclaimed or filled up, but remained covered with water, and, when not occupied by wharves, was open to public use, as the remainder of the flats, that is, by sufferance only; that in the public sale of lots, in 1838 and 1839, notice was given, that the proprietors reserved the right to lay off blocks in front of those designated on the plan or map then exhibited, that is, in front of avenue A, if they thought proper; and this reservation was also stated in the forms of the deeds used in conveying the title to lots; that the Galveston City Company had exercised exclusive ownership over the flats, north of avenue A, by granting wharf privileges; by selling water lots; by prohibiting the digging of earth, and in various other ways, inconsistent with a dedication; and that no exclusive use of the extension of the streets, north of avenue A, either by the City of Galveston or the public, had been made previous to the commencement of the suit.

To rebut the claim of right, under the Act of December 8th, 1851, the defendant showed that the proviso in the fourth section of that act, excepted from its effect, any legal title to wharf privileges, held by persons in the City of Galveston; that he

held a perfect chain of title to the land on which his wharf was erected, and also to the wharf privilege, having purchased them for a valuable consideration, in good faith, long before the passage of the act; that he was also expressly protected by the supplementary Act of February 16th, 1852, on condition that the Galveston City Company should, before May 1st, 1852, convey, in good faith, and by valid deed, in fee simple, clear of all incumbrances, the front half of block 682, and the ground in front, to the channel, to the plaintiffs, and that this condition had been fully complied with.

II. As to the absolute title in the soil, claimed by the defendant, the proof was, that, by the Act of December 9th, 1836, the Republic of Texas had granted a quit-claim title to a league and labor of land, " lying and situate on, and *including* the east end of Galveston island," to Michael B. Menard, and his associates, on certain conditions, as to the payment of the purchase-money, which were complied with; that this grant was notoriously made for the purpose of establishing a commercial town and sea-port; that by the act, the government reserved " one block of lots, in a suitable part of the town, for a custom-house," which was afterwards, by the officers of the government, fixed or chosen, so as to be below high-water mark on the flats; that on January 25th, 1838, a patent was issued to Menard and his associates, under the before-mentioned act, granting the league and labor of land, and including, expressly, the ground up to the channel of the bay; that by the act incorporating the City of Galveston, passed February 5th, 1840, this patent was expressly recognised, and the front line on the bay acknowledged to be the one defined in it, (sec. 19 ;) that under the title to the soil, thus obtained, the Galveston City Company—the assigns and associates of Menard—had continually exercised acts of ownership over the flats since 1838; and that the defendant derived his title to the *locus in quo*, by a regular chain of transfer, under the company.

If, however, the bare title was not perfect and effective, there

was also proof, of the most satisfactory character, of continuous, adverse, or exclusive possession, for sixteen years before the com- mencement of the suit. It was shown that M. B. Menard and his successors, claiming to the extreme boundaries stated in the patents, or up to the channel of the bay, had held possession as owners of the league and labor of land granted to them; that their possession was indicated by unmistakable acts, and exercise of power, in every way that a corporation could act or the nature of the case require; as by the granting deeds to lots in the city to the amount of nearly three thousand, by the leases of city lots, by the sale of water lots and wharf privileges, and by the settlement of a city, of nearly seven thousand inhabitants, the erecting of many wharves, and of a large number of warehouses, stores, and mercantile establishments, under titles derived from this company.

It is only necessary to add, that the *locus in quo* was shown to be a flat, extending to the main, or ship channel, of Galveston bay, on which, at ordinary tides, the water was of little depth; at extreme low tides, occurring five or six times during the year, this flat was left entirely bare, and at extreme high tides, oc- curring about the same number of times, the water in the bay rose in the city as far as avenue D, or three streets south of avenue A; and in extraordinary storms, the whole town site has been covered. The line of ordinary low tide left a portion of all the wharves to the south, on dry land.

Upon this testimony, judgment was given in the court below for the defendant; and the only question, on the assignment of errors, is, whether the plaintiff, under the case presented by the proof, had a cause of action or not; for the fourth ground stated in the motion for a new trial, as to the admission of the deposi- tion of Crosby, cannot be noticed,—no objection having been made on the trial to the reading of the deposition.

It is evident, however, that if the court below erred in over- ruling the general demurrer to the petition, that is to say, if the plaintiff had not *stated* a good cause of action, and if also the

proof showed no possibility of amending, so as to make this petition sufficient, this court will not disturb the judgment below, and in that case it need not look further into the case. We will therefore, first state the grounds on which the demurrer rests.

1. The petition is founded upon two causes of action: 1st. A violation of a city ordinance, by obstructing a *street*. 2d. The maintenance of a public nuisance, in an interruption to navigation. Now, as to the *first*, it appears that the *locus in quo* is covered with navigable water, and has not been filled or graded above the water; it is not, therefore, a *street*. (Commonwealth v. Charlestown, 1 Pick. 180; Kean v. Stetson, 5 Pick. 492.) *Laws* do not change *things*, and the ordinance of 1852, declaring the streets open to the channel, did not make land, under navigable water, a street, or alter its former character. As to the *second*, it is well settled, that a city corporation, having merely special and limited powers, is in no sense, a general trustee, or guardian of *public* interests, or rights, and cannot maintain an action for the obstruction of navigation—a common right—unless it shows some special injury, actually done to itself, as a corporate body—which is not the case here. (Mayor of Georgetown v. Alexandria Canal Co., 12 Pet. 91; Woolrych on Waters, 218, 273.) Even if the assumption of a dedication by the Galveston City Company could be entertained, the legal title remained in that company, and the equitable or usufructuary interest, vested in the individuals constituting the community. The corporation of the City of Galveston had neither. (Kirkham v. Sharp, 1 Whart. 323; Cope v. Grant, 7 Barr, 488.) And it must be alleged, or shown by the facts alleged, that the obstruction complained of, is an actual injury to navigation, not compensated by the benefit it confers. (Rex v. Russell, 6 Barn. & Creswell, 565; Jobson v. Blackmore, 9 Q. B. 991; 58 E. C. L. Rep. 991; Woolrych on Waters, 209, 210, 211; so Part. III. tit. 32, lib. 18, note of Gregorio Lopez.)

2. Should the court think that the plaintiffs showed a sufficient ground of action, and that it was incumbent on the defendant

to meet it by proof, then it becomes necessary to understand the ·exact extent of the plaintiffs' claim. The slip of land lying in front of the end of Bath Avenue, between low-water mark and the channel, is the thing claimed. The right to control this, to exercise authority over it, as a *street* of the city, is the *power* claimed. This power is assumed to be derived, first, from the Act of 1851; secondly, from an actual dedication by the city company to the public. As to the first source, it is not pretended that the Act of 1851 provided any *compensation*, or that any was offered, in fact, to the owners of the soil; nor is it contended by the plaintiffs, that if there were any such owners holding by a valid title, the act would be operative as to them; but it is insisted that the land in question was still the property of the state. It is evident, then, that there are, on this part of the case, two important questions; first, whether the defendant, or any one else, owned the ground in question, by title from the government? secondly, whether there was a dedication of it to *public use?*

III. In opposition to the plaintiffs' case, we contend that the defendant showed a superior title out of the state. The patent to M. B. Menard, and his associates, expressly included the land to the channel, and, of course, conveyed the title thereto in fee; and this title could not afterwards be impaired or divested by the state, except for public uses, and on the payment of compensation. The patent can only be attacked in a collateral action, for fraud in obtaining it, or want of authority in the officer issuing it. The first is not alleged, and the second will not be presumed, but must be affirmatively shown. (Strother v. Lucas, 12 Peters, Rep. 410; Jones v. Garza, 11 Texas Rep. 186, 207.) The *onus* is upon the plaintiffs, to satisfy the court that the president was not authorised by the legislative grant and direction, to issue the patent as it stands, and the construction of the Act of 1836 must not, therefore, be strained against the defendant.

The Act of 1836, grants "one league and one labor of land,

lying and situate on, and including, the east end of Galveston island." By a grant of land, the legal appurtenances, adjuncts and servitudes of the land, are also granted. Being inherent in the land, they pass with it. In determining what these appurtenances were, we must, of course, follow the law in force at that time, the Spanish law, which had as its basis the Roman law. Now, by *that* law, the shore of the sea was appurtenant to the main land, and passed by a royal grant of the main land. (Caepolla de Servitutibus, Part II. chap. 26, §§ 19, 26; chap. 33, § 8.) "So, if the emperor was to grant me a city, he would seem also to grant all the appurtenances, as well in the sea as the land, because the sea is designated as land. Fourth, I inquire whether, under the appellation of the territory of a city, is comprehended also the sea, and the ground in the city itself; and it seems that it is." "To whom, then, do the harbors of an island belong? I answer to him to whom the island belongs." (So Solorzano, I. p. 387, § 37.) And the right to construct moles or piers; i. e. to *wharf out*, belonged to the owner of the adjacent land. (Caepolla II. chap. 28, §§ 4, 6.) "But I ask, whether harbors of the sea, made by the ingenuity of man, are public to all, or belong to the makers? Answer, according to Baldus, that the constructions or erections belong to the builders, but the harbors themselves are public. Moles are also sometimes found built out into the sea, for the sake of making or protecting an harbor. * * * And if a husband receives, as a dowry, a city or territory adjoining the sea, and shall build moles in the sea, to make or protect the harbor, or to protect the wall of the city or castle given in the dowry, this shall be accounted a necessary expenditure." The foregoing is repeated and approved in the Curia Filipica, Part II. lib. III. chap. 1, § 37. Another right, expressly given by the civil and Spanish laws, is the right of occupation of the shore; that is, the first occupant, who builds on the shore, is protected in his possession, so long as he retains it. (Partidas, III. Tit. 28, Laws 3, 4.) "And if there be a house, or any other building, on the

shore of the sea, belonging to any individual, it shall not be destroyed, or used in any manner, without the consent of him who built it, or whose property it is. On the shore of the sea, any man may build a house, or cabin. * * * * Or any other structure, from which he can derive profit, so that he do not prevent the common public use." (So, also, Curia Filipica, Part III. chap. 1, §§ 30, 31; Caepolla de Serv. II. chap. 26, § 3; chap. 27, §§ 2, 3; Saurez, Alleg. XVII. § 10.) This principle is stated in the most emphatic form by Antunez, in his work upon Royal Grants: "Hence the sea may be acquired by right of dominion, in many ways, as by the driving of piles, in order to build upon them; (Dig. XLI. 1, 30, § 4;) and any one building in the sea, or on the shore, makes the building his own, and cannot be prohibited by any one." "But the fact is, that he who builds upon the shore, becomes the owner of the building, *and its site;* therefore the dominion of the shores may be acquired by a private person." (Antunez de Don. Reg. III. chap. 8, §§ 4, 5.) "From what has been said, it appears, that private individuals also may acquire the dominion of the sea, and of other common things, when this can be done without prejudice to the common use." (Id. § 44.)

The sea shore, which is here spoken of, and known in the civil or Spanish law, extended to the highest average annual rise of the water, whether caused by the tide or wind, not meaning the extraordinary tides, occasioned by the equinoctial storms, but the other average highest rise of the water. (Curia Filipica, III. chap. 1, § 29.)

"By the shore of the sea, is meant all that is covered by the water, when it rises highest at any period of the year when its flood and rise is greatest, by its own movement, or by the force of the wind, without overflowing its bed." (So Part III. tit. 28, Law 4; Caepolla II. chap. 27, § 1; Angell on Tide Waters, 68.) And upon this point, the observations of Dominguez, (Illustraçion de la Curia Filipica, vol. 3, pp. 54, 63; and especially in §§ 112, 113, 127-129,) are instructive and satisfactory. They show

that the best Spanish jurisconsults held, that the dominion of the crown over the sea shore, was purely *political*, and did not imply an ownership of the soil, and that private persons could hold the shore either by occupation, accession, or grant, or as appurtenant to their adjacent lands.

The legislative grant of 1836 passed, therefore, with the land, the sea shore as appurtenant thereto; the right to wharf out into the harbor; and the right of occupation or of building upon the shore, and being protected in the use of such buildings. This conclusion follows, from the mere terms of the grant, and when these are clear, courts do not go further; but if they were doubtful, it would be proper to arrive at the intention of the contracting parties, by reference to the object of the grant; the character and situation of the thing granted; the local circumstances, and chiefly the usage and practice under the grant.

These being matters of evidence, we must refer to the common law for rules and examples; for that law was introduced, as to evidence, before the grant was made. Referring to the argument of Mr. Ballinger, on the other points, we confine our citations to the latter point; the application of evidence of usage to determine the extent of the grant. (Woolrych on Waters, 421, 443, 444, 413, 441; Angell on Tide Waters, 283, 262 note; Chad v. Tilsed, 2 Brod. & B. 403; Duke of Beaufort v. Mayor of Swansea, 3 Welsby, H. & Gord. 413; Calmody v. Rowe, 6 Man. Gr. & Sc. 861; Livingston v. Ten Broeck, 16 Johns. 22; Gray v. Bond, 2 Brod. & Bing. 667.) In connexion with this, we may refer to the acts of confirmation, on the part of the government, in recognising the extension of the grant to the channel, in the act of incorporation of the city; in selecting, and afterwards selling the site for a custom house; in refraining from any attempt to interrupt the possession and claim of ownership of the company, and in the acknowledgments contained in the Act of 1851, and the supplementary Act of 1852.

If, however, the court should think that the naked legal title was not vested in the Galveston City Company; that is, that the

patent was invalid as to the flats, on the ground that the Act of 1836 did not authorise its issue, then we claim, that the court, acting in place of a jury, must presume a lost grant from length of possession. The civil and Spanish law allowed the acquisition of the sea shore, by prescription. (Covarruvias, Opera Omn., p. 489, § 10 ; Solorzano, I. 389, §§ 62, 70, p. 390, § 72, *et seq.*,) and the common law; (Woolrych on Waters, 438, 439, 441, *et seq.*, 443, 446, 447 ; Gray v. Bond, 2 Brod. & Bing. 667 ; cases before cited.) And in our state, the period of ten years' possession is sufficient, because it is the longest period known to our law. (Tinnen v. Mebane, 10 Texas Rep. 246; Horton v. Crawford, Id. 382, 392; State v. Purcell, 16 Id. 305.)

IV. Next, as to the dedication. It is contended by the plaintiffs that, even admitting the title to the soil to be in the Galveston City Company, all that portion of the flats in front of the half blocks of the lots laid off, north of avenue A, was dedicated to the public use of the people of the town. To this, we reply, that such a dedication was impossible, because the land was covered by public navigable waters. (Kean v. Stetson, 5 Pick. 492.) And it was not made, but the reverse; for it was expressly reserved to the proprietors, by the resolution of the board, the notice given to purchasers in 1838, by the map itself, and by the deeds given to purchasers.

The only proof admissible, to sustain a dedication, is proof of a *complete legal title*, or long continued use by the people of the town, or express assent on the part of the owner. (Blair v. Odin, 3 Texas Rep. 288 ; Municipality No. 2, v. Orleans Cotton Press, 18 La. 122 ; New Orleans & C. R. Co. v. Carrolton, 3 La. Ann. 285; Linton v. Guilotte, 10 Rob. 360 ; Barranclough v. Johnson, 8 Ad. & E. 99.) But in this case, there is no legal title ; no assent of the owner ; and no use, but the reverse ; an adverse use on the part of the proprietors. The recent case of Lecraw v. The City of Boston, 17 How. 426, is almost exactly in point. There, the city of Boston was the undisputed owner of the street, and, by the ordinance of 1642, the owner, conse-

quently, of the adjacent ground, under water, to the channel, of the harbor; but it was contended that this space, in front of the termination of the street, being necessary to navigation, and the use of the street itself, and having been used by the public without opposition on the part of the city, for a great number of years, should be considered as dedicated to the public use. And the Kentucky cases, on which the present plaintiffs rely, were also cited there; but the Supreme Court of the United States said, that public use, however long, not inconsistent with the right of the owner, could not impede the exercise of that right, and that there was no dedication.

V. Should the court, however, be of opinion, that the case is with the plaintiffs on these points, then we rely upon the proviso of the fourth section of the Act of 1851, and on the supplementary Act of 1852, as a protection for the wharf of the present defendant. The latter act, it was quite competent for the legislature to pass. (Bass v. Fontleroy, 11 Texas Rep. 698, 706; State v. Savannah, R. M. Charlton, 250; Dickinson and wife v. Codwise, 1 Sandf. Ch. 221.) And the testimony clearly shows, that the present defendant comes within the provisions of that act.

ROBERTS, J.—These two cases are submitted together, and involve, in the main, the same questions.

In the first, the plaintiff seeks to establish a right to the whole of the flats, usually covered with water, and lying between avenue "A," in the City of Galveston, and the channel of the bay; a part of which the defendant is alleged to have trespassed upon, and held for a wharf, &c.

In the second, the plaintiff seeks to establish a right to extend "Bath Avenue," from avenue A, northwardly, to the channel of the bay, as a street of the city, and to keep it open as such; and to erect a wharf on the channel at the end of Bath Avenue, which space has been appropriated and used, for a wharf and warehouse, by the defendant; and for which, a fine of $900 is sued for, as being in violation of an ordinance of the city.

Both of the defendants claim to have a good right and title to the portions of said flats, respectively occupied by them, whether in front of the streets of the city, or of the blocks of lots between the streets.

Avenue A, is a street running nearly east and west, and is in that part of the city occupied by the defendants, about the line of ordinary low-water tide; and the land, title to which is in dispute, lies between that street and the channel of the bay, being north of said avenue A, and about 645 feet in width.

The defendants, beside pleading the statutes of limitations, claim title under Menard, the original grantee, by a regular chain of recorded titles, down to themselves, which regular chain is admitted. Menard, as original grantee, claimed a right to the flats, as part of the east end of Galveston Island, sold to him by legislative grant, in 1836, and included in his patent, issued by the President of the Republic of Texas, in January, 1838, which calls for "running with the channel of the bay," in the northern boundary of the league granted.

The plaintiff contends, that the legislative grant did not include the flats, as attempted to be granted by the president in the patent; that, notwithstanding the patent, the right thereto remained in the republic and state of Texas, and was granted to plaintiff by the act of the legislature of 1851. Also, it is contended by the plaintiff, that if the flats were granted by the republic to Menard, as part of the east end of Galveston island, they were dedicated to the public, as an open space between the city, and the navigable channel of the bay.

The Republic of Texas had the power, through its legislative department, to grant that part of the Galveston bay, which lies south of the channel, usually covered with salt water, which constitute what is called the "flats;" and thereby vest an exclusive right in Menard to the soil thereof, and to the full ownership of the same, just as if it had been dry land.

This power results, as a necessary consequence of the absolute sovereignty of the republic, over the territory included in its limits. The southern boundary of that territory was defined by

an act of the Texan congress, to extend from "the mouth of the Sabine river, and running west along the Gulf of Mexico, three leagues from land, to the mouth of the Rio Grande," &c. After annexation of Texas, the state, by an act of the legislature, re-affirmed its "exclusive right to the jurisdiction over the soil, included in the limits of the late Republic of Texas," excepting such as may be vested in the United States, by the Constitution of the United States, and by the joint resolution of annexation. (Hart. Dig., Art. 1631 and 1634.) This claim of the republic upon her coast, may not have been admitted by other nations, further than one marine league from the shore. (Angell on Tide Waters, 2 ; Vattel, 129.) That would very much have depended upon her power to enforce her claim, as we have seen in the case of the British seas, and Danish Sound. (Wheaton's Law of Nations, 152–158 ; 1 Kent, Com. 29.) But as between her own citizens, in respect to the rights to the soil, which they might respectively acquire, the boundaries, prescribed and claimed by the government, is conclusive. (Vattel, 128.) Her right to an inland bay, such as Galveston bay, could not be disputed; both as to right of property in the unappropriated soil, and in the jurisdiction of her government. (Id. 123, 124, 130.)

In the civil law, it is said, that the sea, bays and rivers, with their shores, were common; free to the use of any one, and are deemed to belong to no one. (Angell, 18, 19, 178, 179.) Vattel, on this subject, says, "The shores of the sea, incontestably belong to the nation that possesses the country, of which they are a part; and they belong to the class of public things. If civilians have set them down as things common to all mankind, it is only in regard to their use; and we are not thence to conclude, that they considered them as independent of the empire; the contrary appears, from a great number of laws. Ports and harbors are, manifestly, an appendage to, and even a part of, the country; and consequently are the property of the nation. Whatever is said of the land itself, will equally apply to them, so far

as respects the consequences of the domain, and the empire."
(Angell, 129.)

From the very nature of the property, which the government
possesses in its navigable waters, and bays, and bay-shores, it
can be ordinarily best appropriated, by devoting it to public use;
and by not granting away any exclusive right to it to any one.
Because every one can use it, and derive advantage from it, and
no injury is done to each other in its enjoyment.    It often
happens, however, that the public use and enjoyment, of this
species of property, may be promoted and increased, by allowing
portions of it to become private property ; as for wharves, docks,
and the like, in harbors and ports.    If the government could not
exercise this right, in severing this common property, and appro-
priating portions of it to private use, it would not only curtail
the ordinary powers, which every nation has for self-development,
but it would pre-suppose a deficiency, in the sovereign power, to
control or dispose of what belongs to it.

At common law, the right to such property was vested in the
crown, as a royal prerogative.    The modern doctrine of the
courts of England is, that it is vested in the king, as trustee
for the public, and that he cannot, since the time of *magna
charta*, make a valid grant of it.    (Blundell v. Catterall, 5 B. &
Ald. Rep. 268 ; s. c. 7 Eng. Com. Law Rep. 91.)    There is no
question, but that parliament may grant it.    (Lowe v. Govett, 23
Id. 203 ; Angell on Tide Waters, 88.)    The legislatures of the
several states may grant it, if not previously appropriated by
grant, prescription, or otherwise; provided, the exercise of an
exclusive right, thus granted, does not infringe upon the rights
of the government of the United States, in its power "to regu-
late commerce with foreign nations, and among the several
states."    (Charlestown v. County Commissioners, 3 Met. Mass.
Rep. 202; 21 Pick. Rep. 344; 4 Rawle, Rep. 9; Angell on
Tide Waters, 87.)

There is nothing in this case, which could be construed into
an infringement of this right of the United States; according
to the views taken by Chief Justice MARSHALL, in the case of

Willson & Co. v. Black-Bird Creek Company, 2 Peters, Rep. 245; wherein it appeared, that the legislature of Delaware had authorised the damming-up of a creek, up which the tide flowed, and covered a deep, level marsh.

Whether, then, this legislative grant be considered with reference to the civil law, which was in force in Texas in 1836, or to the common law, to which her people were most accustomed, it must be held, that the government had the power to make it.

This species of property, being land covered with navigable water, embraces several rights that may be separated, and enjoyed by different persons, and may become thereby, partly private and partly public; as, the right to the soil, a right to fish in its waters, the right to navigate the waters covering it, &c. These may be acquired, separately and exclusively, from the proper granting power, or they may be acquired, as it has been held, in England and many of the states, by prescription, and immemorial custom. In some countries, they are held to be acquired as an incident to the ownership of the adjoining lands; as, for instance, the right of the owner of the land on the shore, to extend a wharf across the shore, or even to low-water tide, or to a certain fixed distance. These riparian rights, have been held to have been acquired by various modes; as by grant, by statute, by long custom, by prescription, and the like.

The divisible character of the property, and the different modes of its use, and the diversified modes of its acquisition, have exceedingly complicated the subject, in England, and in the Atlantic states of the Union. Attention is called to this view of the subject, only to show, that much of the legal learning that has been elicited by this complication of the subject, cannot apply here. In 1836, when this grant was made, the government had just been founded, and the country had just been settled, except a few interior towns, such as San Antonio and Nacogdoches, which were the sites of military posts, and to that, mainly owed their existence and growth. The inhabitants were an agricultural, or pastoral people; and the fact, that the plan of the city, when laid off,

26

covered the remains of a pirate's fort, not then entirely obliterated, shows the absence of commerce, and of commercial cities, upon the coast. No old settlements and usage, had conferred prescriptive rights on riparian owners; no immemorial custom, in relation to rights on the coast, had matured into a common law; and no statute had been passed, so far as is known, since the partial settlement of the country regulating or giving rights upon the subject. The coast was clear of such difficulties, and the government was free to make such disposition of its domain, covered with tide-water or not, as it might see proper, without jeopardizing previously-acquired rights.

The act of the Texan congress, passed on the 10th of December, 1836, provided, "that all the right, title, and claim, which the government of Texas has, to one league and one labor of land, lying and situate on, and including, the east end of Galveston island, be, and the same is, hereby relinquished in favor of Michael B. Menard, and such associates as he may hereafter include; and all the right, title, and interest, which the government of Texas now has in and to said land, is hereby vested in said Michael B. Menard, and associates as he may hereafter include; provided, that nothing herein contained, shall affect the vested rights of third persons." (1 Cong. 70.)

The main question is, does this act confer the right to the shore and flats, lying south of the channel of the bay? If viewed as an ordinary grant of land, it does not. The coast, and to the extent of ten littoral leagues in the interior, had been reserved from colonization, since 1824, except by the consent of the general government of Mexico. It had not been the policy of that government to encourage its settlement, or the settlement of the islands, by which it is lined.

On the next day after the passage of this act, another was passed, by which it was resolved, " that all islands belonging to this republic, shall be, and are hereby, reserved for the government use, except the president be authorized, specially, to sell them." (1 Cong. 76.)   Which authority was given in June, 1837.

(1 Cong. 267, 268.) By this it was manifested, that a special control over the islands was assumed by the government. By the civil law, the shores of the sea, of bays, and navigable streams generally, as well as the tide-waters, were jealously guarded from private appropriation, and reserved for common use. As early as 1837, Congress, in establishing a general land office, for the distribution and disposition of lands, enacted "that all streams, of the average width of thirty feet, shall be considered navigable streams," and "shall not be crossed by lines of a survey." (Hart. Dig., Art. 1878.) The same act made provision for diminishing the front line of tracts, surveyed on navigable streams, indicating an anticipated advantage in the use of such streams for navigation. (Art. 1858.)

The well established doctrine of the common law, which is more favorable to private appropriation, than the civil law, is, that an ordinary grant of land upon a bay, whose tide ebbs and flows, does not convey the shore or any of the land of the bay covered with water.

In a grant made by the crown, of "the Island of Brownsea and its shores," a right was claimed to a bay of about sixty acres, situated at one extremity of the island, into which the tide flowed, and which, when the tide ebbed, was a mud flat; it was held, that this description, of itself, was not sufficiently specific, to pass the mud flat or bay, but as it had been accompanied by exclusive possession for forty years, the right was maintained. (Chad v. Tilsed, 6 Eng. Com. Law Rep. 171.) That case is important, in its application to this, as indicating, that the terms of the grant were aided and extended beyond their usual import, by the circumstance of long possession; which was alone consistent with the fact, that the mud flat was intended to be covered by the grant, though not specifically and plainly expressed in it.

In the case of Martin v. Wardell, it appeared, that a large tract of country on the American continent, was conveyed by Charles the second, to the duke of York, with both the right of domain, and right of government. The right of government

of the territory, was ceded back to the crown of England, by the assignees of the duke, and only the right of domain was retained. It was held by the Supreme Court of the United States, that the right to flats covered with tide-water, within said territory, did not remain in such assignees, but was re-invested in the crown. (16 Peters, S. C. Rep. 369.) In that case, the assignees retained only such lands, as were subject ordinarily to private appropriation. They intended to remain the proprietors of what is ordinarily regarded as saleable real estate, as matter of profit; but not the guardians of the public in the administration of an interest, which is usually regarded as common to all, unless specifically excluded from common use.

Again, in the case of Pollard's Lessee v. Hagar, it was held by the Supreme Court of the United States, that the flats covered with tide-water, in front of Mobile, were not retained by the United States, upon the admission of the state of Alabama into the Union, although the United States retained all the unappropriated waste lands in the state. (3 Howard, U. S. Rep. 212.) The object in retaining such waste lands, was for sale; and as these flats were not of a character of property ordinarily sold by a government, but usually held in trust for the public, it could not be supposed that they were intended to be retained.

In both of the last preceding cases, this right of property was held to be an incident of government, and passed with the grant of that power. It is to be observed, that in both those cases the right in the waste lands was retained, and upon a strict literal interpretation, lands covered with tide-water, such as the flats, would have been also retained. But by considering the character of the contracting parties, and the object of the party, in retaining the waste lands, and the uses and purposes to which such property, as land covered with tide-water, like the flats, is to be applied, and its immediate connexion with the common interest, of which the government is the protector; the conclusion was arrived at, that it was not intended to be retained.

The true reason for requiring a more certain and specific in-

tention to a grant, in the case of lands covered by tide-water, connected with bays and other navigable streams, than in case of land not so covered, is believed to be, not any difference in the degree of right, possessed by the sovereign power of the state; but the difference in the character of the property, in its relation to, and connexion with, other rights, such as of navigation, of fishing, &c., which may be, and usually are, enjoyed in common by all the people of a state; and which are usually kept continually under the protection of the government, directly or indirectly.

In view of the full force of this rule of construction, we are satisfied, that this legislative grant was intended by the contracting parties to include the flats, so as to build a city upon Galveston island, with streets and lots running up to, and bordering on the channel of the bay. This conclusion is arrived at, from considering the object of the grant, its locality, and the acts of the contracting parties in relation to it. (1 Wheaton, 116; Vattel, 311; Broom's Maxims, 536; 4 Gill & Johns. 1; 1 Coke on Lit. 59.) This was not an ordinary sale, or donation of land, as upon certificate or scrip, for indefinite purposes; but it was a specific grant, directly made by the government, for a specific object; and it must be understood and construed, with reference to such object. In the same act which made the grant, a part of the east end of the island, including the fort, was reserved; "also one block of lots in a suitable part of the town, for a custom-house, and other public uses, to be selected by an agent, to be appointed by the president for that purpose; to be selected on or before the first day of public sale of lots at that place." The act also stipulated for the payment of fifty thousand dollars for the league and labor, thus granted to Menard. (1 Cong. 71, § 4, 5.) The president was required to make a title in the name of the republic, upon the payment of the money. (Id. § 2, 3.)

These provisions show unquestionably, that negotiations had transpired between the government and Menard, for the building of a town upon the island of Galveston, which would be a

port of entry; and that the subject was practically surveyed, and well considered by them. This is confirmed by extrinsic circumstances. The grant was made large enough to include that part of the island, nearest the bar, where it was practicable to build a town of any considerable size, and where the channel of the bay approached nearest the edge of tide-water. This particular locality was pointed out, as the suitable point for the town, by its relation to the passage into the gulf from the bay; by its situation being suitable to protect vessels as an harbor; by its position in reference to the Trinity and San Jacinto rivers, Buffalo bayou, and East and West bays. The island was cut off from the main land, and surrounded by shallow water, which prevented the approach to the dry land by vessels, but which also cut off all communication with the island, except by water. The only approach to the town, that could then have been anticipated, was through this navigable channel. The town was yet to be built; even building materials, firewood, and provisions, had to be brought to the place by water. The necessities of the country required its immediate erection, as the principal port of entry on the coast, and as the best commercial depot of the republic. Commerce constituted the only inducement to its settlement, and by that alone, must it start into existence. Wharves must be built at great expense, in order to build up the city. How far out must they go? The ordinary tides, rose only eighteen or twenty inches, and advanced and receded about two hundred and fifty feet. From the action and reaction of the waters of the gulf and the bay, through the pass, as affected by the winds, the tides, three or four times a month, overflowed the strand, (avenue B,) which would extend the flats to a width of about seven hundred feet, and as often receded nearly or quite to the channel. Again, five or six times in the year, during the winter, the tides receded to the very channel, leaving the ground entirely free from water; and as often arose to Market street, (avenue D,) extending the flats in width, one thousand feet.

The rule of the civil law, made the shore extend to the line of the highest tide in winter; and if that be adopted in interpreting

the grant, it forced out Menard's right to erect a town, one thousand feet from the channel, and left unappropriated the whole of the intervening space, upon which no one could erect, with any security to himself, any warehouse, wharf, or other building, which were then, as well as now, so necessary to build up the city, and facilitate its commerce. And he had no title, and could convey none, to the lots on the strand; which were from the first sales, regarded as the most valuable for business houses, and upon which the leading business of the city has ever been transacted.

The rule at common law, would restrict the grant to the line of ordinary high tide. Even ordinary low tide would leave a strip in front of shallow water, over three hundred feet. At none of these points would wharves have accomplished any beneficial connexion with the navigable water of the channel. We cannot entertain the idea for a moment, that the parties contracting, in reference to the erection of this commercial city on the bay, contemplated it to be laid off south of the highest tide of winter, or even of ordinary high tide, and made no provision whatever for vesting in any one the right to erect permanent wharves, to communicate with the channel. No one, at that time, could have been induced to hazard the expense of erecting wharves, without being invested with a permanent right,—if not in the soil, at least in the franchise regulated by express law.

If, then, it be admitted, that the contracting parties understood and appreciated the difficulties of the enterprise, and desired its success, (which we cannot doubt,) then it reasonably follows, that they intended to do what, under the circumstances, was absolutely necessary to its accomplishment; and that was, to vest in some one, the right to erect wharves upon the channel. It could not have been designed, at that time, to vest the right in the corporate authorities of the city; for there were then no citizens here to incorporate, and no corporation of the city existed for several years afterwards. (1840.) The president of the republic, it is fair to presume, was consulted, and participated in devising the plans for so important an object; and

fully understood what was the object, and the extent of the grant; and hence, in executing the title, he designated the northern boundary, " beginning at the northeast corner of lot No. 1, in section No. 1, as represented in the plat of survey of the island of Galveston, made by R. C. Trimble and William Lindsey, under direction of the secretary of the treasury, and running thence, due north, one hundred and fifty varas to a stake; thence eastwardly with the channel of the harbor, in the bay of Galveston, and with the general course of said island, at the distance of at least one hundred and fifty varas from the shore, to a stake one hundred and fifty varas from the extreme eastern point of said island," &c.   The reasonable construction of this call is believed to be, (when considered with reference to the object of the grant,) that the line shall run from the beginning point eastwardly, keeping at least one hundred and fifty varas from the shore, to the channel, (and not in a direct line to the nearest part of it,) and then along the channel, as long as its direction corresponds with the general course of the island; and when it does not, then at least one hundred and fifty varas from the shore, to be continued with the general course of the island. It was, doubtless, contemplated at first, and so understood by the president, that these shallow flats would here, as elsewhere, be filled up, out to, or near, the channel, and become a part of the town, with streets and blocks of lots, as other parts of the town.   Hence the right was conveyed by him out to the channel, so that the whole plan of the town might be laid off, with reference both to its present wants, and future development.

So, also, did the city company understand it; as is evidenced by their acts, most unequivocally, during several of the first years of their operations.   As early as October, 1837, a custom-house had been built upon a water block, selected by an agent of the government, and a warehouse was also erected, at that time, upon a water block, by McKenney & Williams; both of which were destroyed in the great hurricane of that month. This was before the patent had issued.   In the spring of 1838, the town having been surveyed, and a map made of it, lots were

sold at public auction. The map showed regular blocks of lots, and streets and avenues, running nearly north and south, and east and west. The bay line was not straight, so as to correspond with the avenues, running east and west, but curved inward, to the south. The survey showed blocks and half blocks, in the water, about the middle of the survey, where the channel approached nearest to the shore. At each end of the survey, the blocks were extended down to, or near to the water, and so as to reach three and a half blocks north of avenue A; and had they been marked out into the water, would have reached the channel of the bay, or farther, for a considerable distance in front of the city, including that part of it, in which the defendant's wharves are situated. The blocks are numbered from east to west, at each end of the survey of the town, just as if they had been marked out and numbered all the way in the water between the two ends. North of avenue A, and in front of the city, is a line of half blocks marked out in the water, numbered 14, 13, 12, 11, 10, 9, 8; thereby leaving it to be understood, that the corresponding numbers in the block 1, 2, 3, 4, 5, 6, 7, would be considered as laid off, to any one who might purchase.

In order that there should be no misapprehension on this subject, a meeting of the directors of the Galveston City Company was held on the 17th day of April, 1838, (the patent, defining the boundaries, having been issued in January preceding,) and by them it was " ordered, that sale of lots, in the city of Galveston, shall be held on Friday, the 20th inst., and it shall be the duty of the agent to have it made known at the time of sale, that the survey of the city is yet incomplete, and that lots are yet to be laid off in front of those represented on the imperfect plan, now prepared for exhibition, but that when a complete survey is made of the entire city, the lots corresponding with the general plan, now presented, will be conveyed to the purchasers," &c., (proceeding to describe the size of the blocks and the size of the lots, and manner of numbering them.) This notice was given at the sales, and the map representing the matter, as here stated, hung in the office of the company for many years,

and was constantly referred to as the recognised map of the town.   This notice is not a reservation of a right by the company to extend the town, if it should choose so to do; but it is in the nature of an undertaking by the company, that lots would be laid off, or considered as laid off, in front, corresponding with the general plan, so as to exhaust the entirety of the land, granted to them, up to the channel.   This shows that "*the entire city,*" when completely surveyed out, would reach the channel, corresponding with the general plan, then imperfectly mapped, as plainly as though it had been so expressed.   And the purchasers of lots on the strand, (avenue B,) would have been greatly surprised to learn that an unbroken strip had been reserved on the north of them, by which they could be cut off from free access to the channel, which was well known to be the only highway of commerce, that could be reached from the city.

By the Supreme Court of Kentucky, where subjects of this character have been often and fully considered, it was said, "that although the cross streets did not appear to cross Water street, yet such extension prospectively, was considered a virtual and necessary consequence of locating the town at such a point, and on such a river." (City of Louisville v. Bank of United States, 3 B. Monr. 144; Kennedy's heirs v. Covington, 8 Dana, 61.)

That the private appropriation of lots on the channel, for wharves, was contemplated, and that streets were to be left open for public use, out to the channel, was abundantly illustrated by the practical action of the founders of the city, in reference to the subject.   In May, 1838, about a month after the first sales of lots, four wharf privileges were granted on lots, and the land in front of them to the channel, to wit, to McKenney & Williams, on lots in block 684; to Levi Jones, on lots in block 737; to James Reed, on a lot in block 737; and to M. B. Menard, on lots in block 681.   Also, in 1840, one was granted to A. C. Allen, in front of block 735.   Upon all these grants, wharves were built out to the channel, and used, without any encroachment upon the streets running to the channel.   This uniformity

in appropriating lots, and the ground in front of them, for the erection of wharves, and not that in front of streets, as laid down on the map, at this early day, by those best acquainted with the object and intention of the grant, is extremely significant, as to the want of a right to appropriate the streets; and, on the other hand, it is unreasonable to suppose, that those persons would have embarked in the business of erecting wharves there, had they entertained the least doubt of the right of the city company, to convey the land to them for that purpose, in front of the lots, to the channel. When the lots were sold, mere certificates of purchase were given; and in 1840, deeds were executed by the company to previous purchasers, in which they say, in reference to the notice given at the sale of lots, "that the said company expressly reserved to itself the right of laying out other lots and squares, with streets and alleys, on the north part of the city, up to the channel of the bay, in conformity with the general plan exhibited at the sale."

The notice referred to at the sale, amounted to something more than a reservation for the sole benefit of the company. But, admitting that it was a reservation for their benefit, of the right of so laying it off, it does not follow, that they thereby reserved the unqualified right of doing anything else with it, other than that of so laying it off in blocks and streets, according to the general plan of the town. It was not until 1844, that we find the city company assuming to transfer any interest or right in the ground in front of the streets, pointing to the channel. The manner in which they did so, manifested a want of entire confidence in their absolute right to it. The deed made in 1846, under which Menard claims the ground in front of Street 22, assumes to convey only "all the title the company has in and to the ground;" and that, under which he claims the ground in front of Street 21, (made as late as 1850,) assumes only to convey a wharf privilege; whereas, the same deeds convey lots, and the ground in front of them, absolutely, without any such qualification. The particular mode in which other

wharf privileges have been granted, on ground in front of the streets, is not stated in the record.

The Act of Congress of the 5th February, 1840, incorporating the City of Galveston, defines its corporate limits, by reference to the patent, as follows : " All that section of territory, lying between Seventh street and Thirty-first street, including the harbor and anchorage of Galveston, and running from the front line on the bay, as defined in the patent or deed, to the Galveston Company, from the government of Texas, to the gulf between the streets aforesaid." (4 Cong. 273.) Here is a recognition on the part of the congress, that the title to Menard to the east end of Galveston island, had been made by a definite line, constituting the front line of the bay, in reference to the harbor and anchorage. This is at least evidence, that the government understood the grant to Menard to extend to the channel. And if satisfied that it was excessive, such a confirmatory reference would hardly have been made to it by the legislature. The 14th section of the same act empowers the mayor, with the consent of the council, to appoint wharfingers ; as it may be directed by any ordinance. The same power was continued in the Act of 1844.

. Thus, the congress anticipated that the city might establish wharves, and regulate them ; and that such a privilege would not be inconsistent with the recognised fact, that the front line of the bay, where wharves must be built, was made the boundary of Menard's grant. But this must have been upon the construction, that it was originally intended that the town, to be built on the island, should have streets running to the channel, which would, as it was thought, give the city control there to erect wharves.

By the strict letter of the legislative grant, Menard's right of property did not extend to the channel. It is extended there, only by resort to the plain intention of the contracting parties. Shall it be extended, then, for the benefit of one contracting party, and not the other ? That would pre-suppose that the object of the government, was to enable him to make a private

speculation. Whatever may have been his object, the only object which, it can be presumed, the government had, was to build a commercial city, and port of entry, on this channel; not to be shut up and taxed for private aggrandisement, but to give it ultimately the means of self-preservation, by a control of the appropriate avenues to the channel of commerce, upon which it was built, whenever it became able to establish and improve them.

The dedication of the streets, does not rest alone on the map or plan of the town, in connexion with the channel of the bay, and the notice proclaimed at the sale, and other auxiliary acts of the interested parties, which, by themselves, might be sufficient; but also upon the same necessary implication, which extends the right of the city company, to the channel; founded upon the plainly manifested intention of the contracting parties, in accomplishing the object for which the contract was entered into, and grant made.

As declaratory and confirmatory of this original intention, the legislature of the state, passed the Act of 1851; which enacted, that " the corporation of the City of Galveston shall have the power and privilege of opening all the streets running north and south on the bay side of said city, to the channel, and shall also have power and right to erect wharves at the end of said streets, as they may deem proper."

This is the only distinct, direct grant, of absolute authority, which the act contains. The third section, gives power to fill up such portions of the flats, below ordinary low tide, as may be deemed necessary for public purposes. This may be construed to indicate a legislative belief, that Menard's grant did not extend below ordinary low tide; or it may mean to give such police authority, as may not be inconsistent with the rights of others. Be that as it may, it is evident the legislature sought, by this act, as it has expressed it, merely to relinquish to the city such rights as it possessed, without affecting " the legal title to wharf privileges, held by persons in said city." If Menard's right did not extend below ordinary low-water tide, then this precaution-

ary reservation was unnecessary. For, through him alone could they have acquired a legal title, as against the government.

This act is construed by the Act of 1852, "not to alter or impair any of the rights heretofore conveyed to Michael B. Menard, his heirs and assigns, by patent from the late Republic of Texas." This Act of 1852, again recognises the right of the city to erect wharves at the end of the streets, on the channel. Had the legislature considered that the unqualified right of property was conveyed to Menard, by the patent, out to the channel, and that there had been no dedication of the streets that far, then, of course, the authority given, to erect wharves in the streets upon the channel, would have been in direct derogation of his right. Both of these acts are predicated upon the assumption, that the city has the right to open the streets to the channel, and erect wharves, unless it has lost it. For the purpose of relieving those who have, in good faith, made improvements previous to the Act of 1851, it provides that they shall not be interfered with, upon a certain condition. This is designed to protect them, notwithstanding they may be in the streets, although they might not have a legal title, upon condition that a certain half block of lots, with the land in front, be conveyed to the city. It was intended by the legislature, as an equitable adjustment of contested rights, between the claims of the city company and of the city, by which those who had erected wharves, in good faith, previous to the Act of 1851, in the streets, or on the ground in front of the streets, should be allowed to retain the exercise of wharf privileges there, and an additional privilege be given to the city, as a compensation for the loss, by the entire appropriation of the north half of block 682, and the ground in front of it.

In the case of Bass v. Fontleroy, 11 Texas Rep. 698–708, where an act of the legislature, incorporated a city, and donated lands included therein, for the erection of certain buildings, and the balance to be applied to education, and afterwards the charter was repealed; it was held, that until the trust had

been executed, it was competent for the legislature to change or abolish it; that the conditional trust, for educational purposes, being a public charity, while unexecuted, remained subject to the same legislative power; and that both trusts were extinguished by the repeal of the charter of incorporation; so that a trustee could not be appointed by the court to administer them.

The appropriation of the streets to the channel, in front of those laid off, according to the plan of the town, by the understanding of the contracting parties in its foundation, was necessarily prospective, from the condition of things at the time of the grant, and at the time of laying off the city, and selling the lots; and this right never having been exercised, until the Act of 1851, it will be worthy of consideration, should the question practically arise, whether or not the state legislature did not have the power to make this equitable adjustment, as it seems that the city company have complied with the conditions imposed upon them, by making title to the city for north half of block 682, and the ground in front of it. It is not necessary to determine that question, as it will hereafter be shown.

The right, then, of Menard, and his vendees, to the soil in the flats, in front of the lots, out to the channel, is fully recognised. This may, in the course of time, when they are reclaimed, by being filled up, so as to become the site of business houses, be subject to the right of opening cross streets, when it can be practically done, and where such right may not have been lost. This right to the soil on the channel, in front of the lots, may be devoted to wharves, and the like, without being subject to the control of the public. Lord HALE says: "If A. hath the *ripa*, or bank, of the port, the king may not grant a liberty to unlade upon the bank, or *ripa*, without his consent, unless custom had made the liberty thereof free to all, as in many places it is; *for that would be a prejudice to the private interest of A., which may not be taken from him without his consent.*" (Angell on Tide Waters, 180; Blundell v. Catterall, 7 Eng. Com. Law Rep. 91; Irwin v. Dixion, 9 Howard, 33.) A restriction to this right of property, common to all property, which it will not be ne-

cessary now to notice particularly, is, that being in a navigable harbor, and port of entry, it must not be so used as to be a common nuisance. It is held, at common law, that the king himself cannot authorise a common nuisance. (*Supra*, and see Commonwealth v. McDonald, 16 Serg. & R. 390; Angell on Tide Waters, 199–209, and note.)

The right, also, of the city to the opening, improvement, and use of the streets, running out to the channel, with the right to build and control wharves in front of them, is fully recognised.

Whether this right has been taken away, in whole or in part, by the running of the statute of limitations, is the remaining question. The general rule is, that the statute does not run against the state. If the right to these streets remained in the state until used, then the state had the power to make the equitable adjustment, contained in the Act of 1852; which would give the defendants a right on easier terms, than they could acquire it, by the statute of limitations. If the right to these streets was conveyed to Menard, with the qualification, understood and annexed, of dedication; and they were dedicated, to the town and public, for common use, then, the same rule does not necessarily apply.

The view entertained, cannot be better expressed, than by a quotation from an ably discussed case in the Kentucky Reports. "It only remains, then, to enquire how far any portions of the slip in question, have been freed from the dedication to the public, and become private property, by an adverse possession and claim, of individual right for twenty years, before this suit was brought. That the public right, as growing out of the dedication in this case, was subject to be divested and defeated by such possession, admits, as we think, of no doubt. The dedication was not to the use of the commonwealth, as a corporate being, and invested no title or interest in it. The maxim, *nullum tempus occurit regi*, is, therefore, inapplicable. And there is nothing to exempt the right, which vested really in the

town and its citizens, to be upheld by them for the public, from the operation of the statute of limitations, or from the presumptions arising from adverse claim and possession, as they would apply in ordinary cases of private rights, or public easements. (Rowan's Executors v. Town of Portland, 8 B. Monroe, 259.) This case applies, in many respects, to the one now under consideration, and sustains the view taken of it. (See also Angell on Lim. 392, and note; 1 Cush. Mass. 313, 395; 1 Iredell, N. C. 535.)

Our statute of limitations of five years, confers upon the possessor "full title, precluding all claims," except that of the government, and saving the disability of nonage, coverture, or insanity. (Hart. Dig. 2392.) By our statute, also, the right of entry is barred in ten years. (Art. 2390.) It has been often held, as to ways and water-courses, that if the right of entry be barred, the right of recovery is lost. (Angell on Lim. § 300.) The possession, which will give title to a street, under this statute, should not only be under claim of a deed, &c., but it should be adverse; and so exclusive in its nature, as to give notice, unequivocally, of an assertion of individual right to the street. This strictness in the rule, as to possession of streets and other common property, results as a necessary consequence of the character of the property, and the uses to which it is applied. Nothing short of a visible appropriation of it, to the exclusion of the public, except at the discretion of the possessor, can, in such case, be held to be adverse. (Angell on Lim. §§ 390, 392, note, 402, note, 403; Wheeler v. Stone, 1 Cush. Mass. 313; Drake v. Curtis, Id. 395; Williams v. Buchanan, 1 Ired. N. C. 535.)

To apply these principles to the cases before us:—Luffkin's wharf has been in his possession over five years, under a deed duly recorded. He has used it as his own, and charged wharfage regularly, and paid taxes thereon. His wharf was built in the street; and the wharf, and houses erected in connexion with it, cover the whole front of Bath avenue; leaving no doubt as to his assertion of exclusive individual ownership, as his own

27

private property, during all the time. The judgment of the court below, sustaining his defence to the action, is not believed to be erroneous, and therefore it is affirmed.

Menard's claim is embraced in three grants from the City Company. The first deed included lots, and the ground in front of them; and on that it was originally built, so as not to interfere with the street, running to the channel. The second deed conveyed certain lots, adjoining those in the first deed, and the land in front of them; and also the right of the company to the front of Street 22. The third deed conveys block 740, and the ground in front of it, and also the wharf privileges in front of Street 21. It is to be noticed, that the ground in these streets, is conveyed as tracts distinct from the lots, though embraced in the same deeds. Upon Street 22, there is not *any wharf* or other structure shown to exist, and, therefore, the statute of five years does not apply to it. On Street 21, there is some sort of wharf, or structure in connexion with a wharf, erected since the grant made to it by the City Company, in March, 1851; but it does not appear when, or that it was before the passage of the act of the legislature of December, 1851. Hence, neither the statute of five years, nor the equitable adjustment in the Act of 1852, is shown to apply to it.

The judgment of the court, therefore, so far as it sustained his right to the lots, and the ground in front of them, is correct; and may be so far sustained: and so far as it denied the right of plaintiff to recover, and hold as streets, Nos. 21 and 22, it was erroneous; and so far must be reversed. And the judgment may be reformed, and rendered in accordance with this opinion.

Judgment in the case against Menard, reversed and reformed; in the case against Luffkin, affirmed.

WHEELER, C. J., did not sit in these cases.