

# THE ATTORNEY GENERAL

## OF TEXAS

GERALD C. MANN

JⓍ̶X̶X̶X̶X̶X̶X̶X̶X̶X̶X̶ERD

ATTORNEY GENERAL

AUSTIN 11, TEXAS

March 29, 1939

Honorable Bascom Giles
Commissioner of the General Land Office
Austin, Texas

Opinion No. 0-523

Re: Effect of Section 10, Ch. 271
General Laws of 1931, on pre-
existing river bed oil and gas
lease

Dear Mr. Giles

This acknowledges receipt of and is in reply to your letter
of March 17, 1939, in which you request the opinion of this Department
upon the question of whether or not Section 10 of Chapter 271, General
Laws of 1931, repealed the $2.00 per acre lease rental provision con-
tained in Chapter 140, General Laws of 39th Legislature, 1925. You fur-
ther request our opinion as to whether or not you should issue a renewal
lease to Mrs. Nonie O'Brien upon the expiration of the present oil and
gas lease which she holds covering 398.229 acres in the Trinity River bed
in Liberty County, Texas.

As we understand your letter, on October 5, 1928, permit No.
12724 to prospect for oil and gas was issued to Mrs. Nonie O'Brien cover-
ing the portion of the Trinity River bed in question. On April 30, 1929,
after proper proof of the discovery of oil had been made to your office,
oil and gas lease No. 12724 was issued to Mrs. Nonie O'Brien, her heirs
and assigns, said lease having been issued under the terms and provisions
of Chapter 83, Acts of 1917, as amended by Ch. 140, Acts of 1925, 39th
Legislature, which latter statute appears as Article 5344, Vernon's Civil
Annotated Statutes, 1925, said article reading as follows:

"Upon the payment of $2.00 (two dollars) per acre
for each acre in the permit a lease shall be issued
for a term of ten (10) years, or less, as may be desired
by the applicant, and with the option of a renewal or
renewals for an equal or shorter period, and immediately
after the experation (expiration) of the first year after
the date of the lease, the sum of (two) ($2.00) dollars
per acre shall be paid during the life of the lease, and
in addition thereto, the owner of the lease shall pay a sum
of money equal to a royalty of one-eighth of the value of
the gross production of petroleum. The owner of a gas well

shall pay a royalty of one-tenth of the value of the metre output of all gas disposed of off the premises; provided, however, that the provisions hereof as to the payment of two ($2.00) dollars per acre during the lease period and the life of the said lease shall not apply to leases of bays, marshes, reefs, saltwater lakes or other submerged lands containing as much as one hundred (100) acres but not in excess of five hundred (500) acres upon which as many as five wells have been drilled, and upon which an expenditure of as much as one hundred thousand ($100,000.00) dollars has been made. The drilling of said wells and the expenditure of said amount to be established to the satisfaction of the commissioner of the land office."

You attached to your letter a certified copy of the lease issued to Mrs. O'Brien. Such lease on page 1 thereof recites that a permit to prospect for oil and gas had been previously issued to Mrs. O'Brien under the provisions of Chapter 83 of an Act of March 16, 1917, and Acts subsequent thereto. Paragraph numbered 1 on page 2 of said oil and gas lease, in part, reads as follows:

"In addition to the two dollars per acre already paid on each acre included herein, the owner of the rights herein conveyed shall pay a like sum annually hereafter in advance on the area included herein, which shall be paid on or before the expiration of each year during the life of this contract, and in addition thereto, the owner of the rights herein conveyed shall pay to the State of Texas at the General Land Office of Texas, at Austin, Texas, a sum of money equal to a royalty of one-eighth of the value of the gross production of petroleum and shall pay a sum of money equal to ten per cent of the value of all gas sold."

You further state in your letter that the first year lease rental of $2.00 per acre was paid in 1929 and like payment was made in 1930; that beginning with the third year lease rental the payment was reduced to 25 cents per acre under provisions of Section 10, Chapter 271, Act of May 29, 1931, and that all subsequent annual payments have been at the rate of 25 cents per acre; that the 10 year period for which the lease was issued will expire April 30, 1939, and that the lessee has written to you making the request that a renewal be issued.

As the lease in question was issued on April 30, 1929, when Chapter 83, Acts of 1917, as amended by Chapter 140, Acts of 1925 was in force, we are of the opinion that the payment of rentals on such lease is governed and controlled by Chapter 140, Acts of 1925. The effect of Chapter 140, Acts of 1925, in our opinion, is to require a cash payment at the time of the issuance of the lease of $2.00 per acre for each acre included in the original permit, and a further annual rental payment of

$2.00 per acre during the life of the lease, and in addition thereto, the oil and gas royalty provided in said act shall be paid in case of production. The statute plainly says that "the sum of $2.00 per acre shall be paid during the life of the lease." It is indisputable that the life of the lease in question to Mrs. O'Brien is fixed both by the terms of Chapter 140, Acts of 1925, and by the provisions in the lease itself, at a period of 10 years from April 30, 1929, with a right to renew the same as provided in Chapter 140. Therefore, a requirement of the payment of rental of $2.00 per acre during the life of the lease, in our opinion, requires an annual payment of $2.00 per acre for each and every year that the lease remains in force, including any renewal term. We do not believe that the 39th Legislature in enacting Chapter 140, Acts of 1925, which chapter expressly amends subdivision 2, section 7 of Chapter 83, Acts of 1917, 35th Legislature, intended thereby to release the State's lessee from the payment of annual rentals stipulated by the Act in case production was secured. The only change which Chapter 140, Acts of 1925, made in Chapter 83, Acts of 1917, was to insert the word "immediately" in place of the word "annually" which appeared in the 1917 Act and to add a proviso to the 1917 Act which proviso is not relevant to your inquiry under the facts presented by your letter.

We cannot escape the conclusion that had the Legislature intended to abolish the requirement of the 1917 Act for the payment of annual rentals in case of production, it would have used language clearly indicating such an intention. Such intention also could have been clearly indicated by the Legislature by simply striking from the 1917 Act the phrase "shall be paid during the life of the lease". In the absence of any such action on the part of the Legislature, we must, of necessity, hold that the Legislature did not intend to release lessees from the payment of the $2.00 per acre annual rentals. The proper construction of Article 5344, in our opinion, is that such article requires the payment of annual rentals of $2.00 per acre during the entire life of the lease even after production is secured.

The further question is presented by your request for an opinion as to the effect of Section 10, of Chapter 271, Acts of 1931, Regular Session of the 42nd Legislature, which appears as Section 10 of Article 5421c, Vernon's Annotated Civil Statutes of 1925.

Section 10 of Chapter 271 reads as follows:

"The areas included herein shall be leased for a consideration, in addition to the cash amount bid therefor, of not less than one-eighth (1/8) of the gross production of oil, or the value of same, that may be produced and saved, and not less than one eighth (1/8) of the gross production of gas, or the value of same, and not less than one-eighth (1/8) of the gross production of sulphur, or the value of same that may be produced, that may be produced and

sold off the area and not less than one-sixteenth (1/16)
of the value of all other minerals that may be produced,
and an additional sum of twenty-five cents an acre per year
for each year thereafter until production is secured. When
production has been secured in commercial quantities and
the payment of royalty begins and continues to be paid,
the owner shall be exempt from further annual rental payments
on the acreage. The provisions of this article in respect to
payments of rental after production and the cessation of pro-
duction shall apply to leases heretofore issued by the State
on any area except lands belonging to the State University and
eleemosynary institutions. If production should cease and
royalty not be paid, the owner of the lease shall, at the end
of the lease year in which the royalty ceased to be paid and
annually thereafter in advance, pay twenty-five cents per
acre so long as such owner may desire to maintain the rights
acquired under the lease, not to exceed five (5) years from
the date of said lease."

You will observe that the final sentence of Section 10
above limits the time for which a lease may be kept in force by payment
of 25 cents per acre rental to a period of five years. In your letter
you state that the lessee of the particular lease in question began the
payment of reduced rentals of 25 cents per acre in 1931, or eight years
ago. We think clearly that if Section 10 of Chapter 271 could be held
to apply to the river bed lease in question which was issued in 1929,
nevertheless, such lease after the year 1936 was not entitled to the bene-
fit of the reduced rental provisions of Chapter 271.

However, as the question as to the effect of Section 10 of
Article 5421c will doubtless often arise in the future with respect to
river bed leases where the five year limitation period has not expired, we
believe the question of the application of Chapter 271 to any such leases
on river beds can and should be answered at this time without respect to
the expiration or non-expiration of the five year limitation period. In
determining the effect of Section 10, Article 5421c on river bed leases,
two questions are involved. First, does Section 10 by its terms apply to
or purport to apply to river bed leases? Second, if Section 10 is con-
strued as applying to or purporting to apply to river bed leases, then is
such statute, so construed, constitutional? Upon examining the caption
of Chapter 271, Acts of 1931 (Vernon's Annotated Civil Statutes, Article
5421c), we do not find in any part thereof any mention of a subject relat-
ing to the lease, sale or development of river bed areas. The caption
is confined to a statement that the act is one to "regulate the sale and
lease of lands set apart for the benefit of the public free school fund,
and to provide for the disposition and sale of minerals contained in all
islands, salt waters, lakes, bays, inlets, marshes and reefs owned by the
State within the jurisdiction of Texas, and all unsold public free school

lands both surveyed and unsurveyed". . . and "providing generally the method and means for the sale of public school lands and the lease and development of the public school lands and coastal areas." Upon examining Section 1 of Chapter 271, which section purports to enumerate specifically the lands and areas which are subject to control and sale under the provisions of Chapter 271, we find this significant language:

"All lands heretofore set apart to the public free school funds under the Constitution and laws of Texas, and all of the unappropriated and unsold public domain remaining in this State of whatever character, except river beds, and channels, and islands, lakes and bays, and other areas within tide water limits, are subject to control and sale under the provisions of this Act."

Thus we find that the caption of the statute in question fails to mention at any point that one of the subjects of the Act is river beds or leases thereon or the payments of rentals on said leases. We further find that Section 1 of the Act expressly excepts river beds and channels from control or sale under the Act. It is not until Section 10 in the body of the Bill is reached that we find any mention made of lands other than those expressly designated in Section 1 of the Act and even Section 10 of the Act does not expressly refer to river beds or to leases thereon. In fact, Section 10 of the Act begins with the language, "the areas included herein shall be leased * * *", thereby indicating that Section 10 will deal only with the areas specifically enumerated in Section 1 of the Act. The only language in Section 10 which is susceptible of the construction that river beds are included in Section 10 is found in that sentence of Section 10 reading as follows:

"The provisions of this article in respect to payments of rental after production and the cessation of production shall apply to leases heretofore issued by the State on any area except lands belonging to the State University and eleemosynary institutions."

In State v. Bradford, 50 S. W. (2) 1065, the Supreme Court of Texas held that Article 5416, 1925 R. C. S., did not include nor have the effect of setting apart river beds to the Permanent Free School Fund of Texas, notwithstanding the fact that Article 5416 contained the following language:

"All lands heretofore set apart under the constitution and laws of Texas, and all of the unappropriated public domain remaining in this State of whatever character, and wheresoever located, including any lands hereafter recovered by the State, except that included in lakes, bays and islands along the Gulf of Mexico within tidewater limits, is set apart and granted to the permanent school fund of the State."

In reaching its conclusions in State v. Bradford, supra, the Court said:

"In view of the importance of this matter to the State and the whole people, the courts of this state have consistently held that all grants with respect to lands under navigable waters, such as river beds and channels, are strictly construed against the grantee; that, if there is any ambiguity in the act, it will be construed in favor of the state; and, unless the act contains plain and unmistakable language expressly conveying the land under river beds and channels, it will not be construed to include them. In other words, before a statute will be construed to include land under navigable waters, such as river beds and channels, it will have to be expressed in plain and positive language and not in general language. Landry v. Robison, 110 Tex. 295, 219 S. W. 819, 820; Roberts v. Terrell, 101 Tex. 577, 110 S. W. 733; City of Galveston v. Menard, 23 Tex. 349; Rosborough v. Picton, 12 Tex. Civ. App. 113, 34 S. W. 791, 43 S. W. 1033; Hynes v. Packard, 92 Tex. 49, 45 S.W. 562; Dolan v. Walker, 49 S. W. (2d) 695 (not yet reported (in State report); Wiel on Water Rights in the Western States, Section 898."

In view of the fact that neither the caption nor the body of Chapter 271, Acts 1931, at any point mentions specifically river beds, and also in view of the fact that Section 1 of said Act expressly excepts river beds from the lands subject to control or sale under said Act, we feel compelled to hold, in harmony with State v. Bradford, supra, that river beds or leases thereon, or the payment of rentals on such leases, are not affected by Section 10, Chapter 271, and that leases on such areas must be considered in the same manner as if said Act had never been passed.

If we are in error in the conclusion just expressed, and if river beds should properly be held to be included in Section 10 of Chapter 271, we, nevertheless, must conclude that Section 10 so construed would not be effective to reduce from $2.00 to 25 cents per acre the rentals payable on the river bed lease in question. This conclusion is expressed because of the provisions of Article 3, Section 35 of the Constitution of Texas, which, in part, provides as follows:

"* * *no bill except general appropriation bills shall contain more than one subject which shall be expressed in its title", and that as to any subject which is not expressed in the title of the bill, such act shall be void.

To construe the body of Section 10, Chapter 271, as including and applying to river beds and river bed leases would bring the body of the bill in conflict with the caption thereof and with the constitutional provision above quoted, and the necessary result would be that such portion of Section 10 as applies to river bed leases would be unconstitutional and void.

Although we entertain serious doubt as to the constitutionality of the provisions in Section 10 of Chapter 271, with respect to reduction of rentals to 25 cents per acre after production on any tract of State land covered by an oil and gas lease executed prior to 1931, we make no decision of such question in this opinion for the reason that such question is not directly presented by your letter and is unnecessary to the opinion expressed above.

The construction we have given in this opinion to Article 5344 is contrary to the construction given to such Article by a former Attorney General in an opinion written by George T. Wilson, Assistant Attorney General, dated October 27, 1931, addressed to Hon. J. H. Walker. Accordingly such opinion and any other prior opinions which construe Article 5344 or Section 10 of Article 5421c, Vernon's Annotated Statutes, in conflict with this opinion are herewith expressly withdrawn and overruled.

You are, accordingly, advised that in the opinion of this Department, Section 10 of Chapter 271, Acts of 1931, did not repeal the $2.00 per acre lease annual rental provided in the lease in question, and such act did not reduce such rental to 25 cents per acre. You are further advised that it is the opinion of this Department that a renewal lease should not be issued covering the area in question until all accrued rentals at the rate of $2.00 per acre per year are paid in full.

Yours very truly,

ATTORNEY GENERAL OF TEXAS

By:  Robert E. Kepke  /s
     Robert E. Kepke
     Assistant

REK:BT:m

This opinion has been considered in conference, approved and ordered recorded.

Gerald C. Mann /s
Gerald C. Mann
Attorney General of Texas